PALMER, J.
 

 The issue presented by this appeal is whether article first, § 7, of the Connecticut constitution
 
 [1]
 
 prohibits the police from conducting a warrantless canine sniff of the front door of a condominium in a multiunit condominium complex, and the common hallway adjacent thereto, for the purpose of detecting marijuana inside the condominium. The state appeals
 
 [2]
 
 from the judgment of the trial court, which suppressed
 evidence seized from the condominium of the defendant, Dennis Kono, following such a canine sniff. The trial court concluded that the canine sniff constituted a search within the meaning of the fourth amendment to the United States constitution and, therefore, required a warrant predicated on probable cause. We conclude that the canine sniff violated article first, § 7, and, accordingly, we affirm the judgment of the trial court.
 
 [3]
 
 I
 

 THE FACTS
 

 The record reveals the following undisputed facts. In May, 2012, the Berlin Police Department received an anonymous tip that the defendant was boasting about growing marijuana at a condominium complex on Main Street in the town of Berlin. The case was assigned to Detective Shaun Solek, who determined that the condominium complex in question was a former factory located at 10 Main Street. Solek also discovered that the defendant lived in unit 204. Because the complex was still under construction, Solek contacted the developer, Corporation for Independent Living (developer), to request permission to enter the building. The developer referred Solek to the property manager, Connecticut Real Estate Management, whose owner, Alyssa Pillion, signed a consent form allowing Solek and Officer Eric Chase, a canine handler with the Berlin Police Department, to conduct a canine examination of the common areas of the building.
 

 On the afternoon of May 29, 2012, Solek and Chase went to the condominium complex and were admitted into the building by Stephen Martino, the developer's property manager. As the trial court found, "[t]he first two floors contained thirty-four residential units, only a portion of which [was] completed and occupied. The outside doors to the multiunit building are normally
 locked, and access is gained through a keypad. Chase, who is a trained canine handler, was accompanied by his German Shepherd dog, Zeusz. Zeusz had been trained to detect eight substances including marijuana, hash [ish], crack cocaine, cocaine, ecstasy, and methamphetamine. Prior to the search of the complex, Chase was not informed ... which condominium unit was under investigation.
 

 "Chase first had Zeusz conduct a presearch of the first floor common hallway. During the presearch, Zeusz is allowed to walk throughout the hallway without direction from his handler. After the presearch, Chase conducted a directed search in which Zeusz was commanded to sniff at the bottom of the front door of each condominium [unit] on the first floor. The same presearch and directed search procedures were also conducted on the second floor. When Zeusz performed his sniff at the bottom of the door to unit 204, the dog sat
 down in front of the door, which constituted a passive alert that [Zeusz] had detected contraband. Chase directed Zeusz to perform a second directed search on the second floor and Zeusz again gave a passive alert for drugs at unit 204. Chase knocked on the door but received no response. Chase remained at the door to [e]nsure that no one entered the premises, and Solek left to prepare a search warrant for [the] unit .... Approximately four hours later, Solek returned with a signed search warrant. Upon executing the warrant, the police discovered an indoor greenhouse containing marijuana plants, as well as seeds, lighting equipment and various firearms." The defendant was arrested and charged with several drug offenses and illegal possession of an assault weapon.
 

 II
 

 THE TRIAL COURT'S DECISION
 

 The defendant subsequently filed a motion to suppress the evidence seized from his condominium on
 the ground that a canine sniff of the threshold of his home, for the purpose of investigating the home's contents, constituted a search under both the fourth amendment and article first, § 7, of the state constitution. Specifically, the defendant argued that his front door and the hallway adjacent thereto were within the constitutionally protected curtilage of his condominium unit such that the entry of a dog into that area for the purpose of conducting a drug sniff constituted a trespass. The defendant further argued that a sniff by a well trained narcotics dog for the purpose of detecting drugs inside his home violated his reasonable expectation of privacy under
 
 Katz
 
 v.
 
 United States
 
 ,
 
 389 U.S. 347
 
 ,
 
 88 S.Ct. 507
 
 ,
 
 19 L.Ed.2d 576
 
 (1967). See
 
 id., at 351, 353
 
 ,
 
 88 S.Ct. 507
 
 (inquiry for fourth amendment purposes is whether individual "seeks to preserve [something] as private" and whether that subjective expectation of privacy is objectively "justifiabl[e]" under circumstances); see also
 
 id., at 361
 
 ,
 
 88 S.Ct. 507
 
 (Harlan, J., concurring) (application of fourth amendment depends on whether individual has "exhibited an actual [subjective] expectation of privacy" and whether that subjective expectation is "one that society is prepared to recognize as 'reasonable' "). The trial court agreed that the canine sniff violated the defendant's reasonable expectation of privacy under the fourth amendment and granted the defendant's motion to suppress. In light of its determination that the police had violated the federal constitution, the court did not reach the defendant's claim under the state constitution. The trial court did note, however, that this court "has to date [declined to rule] on whether a canine sniff is ... a search under article first, § 7, of the Connecticut constitution ...." (Citations omitted.)
 
 State
 
 v.
 
 Kono
 
 , Superior Court, judicial district of New Britain, Docket No. H15N-CR-12-0264061-S,
 
 2014 WL 7462049
 
 (November 18, 2014) ; see, e.g.,
 
 State
 
 v.
 
 Waz
 
 ,
 
 240 Conn. 365
 
 , 371,
 
 692 A.2d 1217
 
 (1997) (declining to decide whether canine sniff of parcel
 constituted search under article first, § 7, because, "even if it did, the state constitution requires no more than a showing that the investigating officers had a reasonable and articulable suspicion that the parcel contained contraband").
 
 [4]
 

 In reaching its determination, the trial court relied on
 
 United States
 
 v.
 
 Thomas
 
 ,
 
 757 F.2d 1359
 
 , 1367 (2d Cir.), cert. denied sub nom.
 
 Fisher
 
 v.
 
 United States
 
 ,
 
 474 U.S. 819
 
 ,
 
 106 S.Ct. 66
 
 ,
 
 88 L.Ed.2d 54
 
 (1985), and cert. denied sub nom.
 
 Wheelings
 
 v.
 
 United States
 
 ,
 
 474 U.S. 819
 
 ,
 
 106 S.Ct. 67
 
 ,
 
 88 L.Ed.2d 54
 
 (1985), and cert. denied sub nom.
 
 Rice
 
 v.
 
 United States
 
 ,
 
 479 U.S. 818
 
 ,
 
 107 S.Ct. 78
 
 ,
 
 93 L.Ed.2d 34
 
 (1986), in which the Second Circuit held that a canine sniff of a person's front door in a multiunit apartment building, for the purpose of detecting drugs inside the apartment, constituted a search within the meaning of the fourth amendment. The trial court also relied on
 
 Florida
 
 v.
 
 Jardines
 
 , --- U.S. ----,
 
 133 S.Ct. 1409
 
 , 1417-18,
 
 185 L.Ed.2d 495
 
 (2013), and
 
 Kyllo
 
 v.
 
 United States
 
 ,
 
 533 U.S. 27
 
 , 34-35, 40,
 
 121 S.Ct. 2038
 
 ,
 
 150 L.Ed.2d 94
 
 (2001), in which the United States Supreme Court held that a canine sniff conducted within the curtilage of a single-family residence (
 
 Jardines
 
 ) and the thermal imaging of a single-family residence (
 
 Kyllo
 
 ), for purposes of detecting marijuana therein, violated the fourth amendment to the United States constitution. Describing the holding in
 
 Thomas
 
 as "prescient," the trial court noted that, although the Second Circuit's view was once considered an outlier,
 
 Kyllo
 
 and
 
 Jardines
 
 had vindicated the Second Circuit's determination that a canine sniff of the exterior of a person's home, even one located in a
 multiunit apartment building, violates the fourth amendment if the purpose of the canine sniff is to detect drugs inside the home.
 

 The trial court also rejected the state's contention that the search did not require a warrant supported by probable cause "because a dog sniff can ... determine [only] whether a home contains contraband, and no one has a reasonable expectation of privacy in contraband." In support of this contention, the state relied on
 
 United States
 
 v.
 
 Place
 
 ,
 
 462 U.S. 696
 
 , 698,
 
 103 S.Ct. 2637
 
 ,
 
 77 L.Ed.2d 110
 
 (1983), and
 
 Illinois
 
 v.
 
 Caballes
 
 ,
 
 543 U.S. 405
 
 , 410,
 
 125 S.Ct. 834
 
 ,
 
 160 L.Ed.2d 842
 
 (2005), which held, respectively, that a canine sniff of luggage at a public airport and a canine sniff of a motor vehicle are not searches for fourth amendment purposes because a subjective expectation of privacy in contraband is not recognized as reasonable, and a canine sniff for illegal drugs reveals only the existence of that contraband and nothing more.
 
 [5]
 
 The trial court explained that, although "it is true that a canine sniff is not a search when used to detect drugs in luggage at an airport;
 
 United States
 
 v.
 
 Place
 
 , supra, [at 707],
 
 103 S.Ct. 2637
 
 ; or in a motor vehicle;
 
 Illinois
 
 v.
 
 Caballes
 
 , supra, [at 409],
 
 125 S.Ct. 834
 
 ;
 
 Jardines
 
 teaches us that the use of a drug detection dog is a search when [the dog] is used to investigate the contents of someone's home. We also know from
 
 Kyllo
 
 that the contraband distinction stops at the front door of a home because, in the home ... all details are intimate details ....
 
 Kyllo
 
 v. [
 
 United States
 
 ], supra,
 
 533 U.S. at 37
 
 ,
 
 121 S.Ct. 2038
 
 ." (Internal quotation marks omitted.)
 Finally, the trial court rejected the state's contention that a warrant was not required because "the police were lawfully present in the common hallway outside the defendant's front door," an area where, in the state's view, the defendant had no reasonable expectation of privacy or any property interest sufficient to protect against the officers' warrantless intrusion. In the trial court's view, it was immaterial that the police were lawfully present in the hallway, or that the defendant had a diminished expectation of privacy in the common areas of his condominium complex, because the privacy interest at stake did not relate to those areas but, rather, to the inside of the defendant's home. The trial court also expressed concern that allowing the police to conduct warrantless canine sniffs of the front doors of apartments and condominium units but not of single-family homes-the practice found to violate the fourth amendment in
 
 Jardines
 
 -would impermissibly apportion constitutional rights on the basis of economic class.
 

 Specifically, the trial court stated: "The use of a drug detection dog situated in a common hallway outside the front door to a condominium [unit] is no less an intrusion into the privacy of one's home than the [use of a] drug detection dog ... on the front porch of the single-family residence in
 
 Jardines
 
 . To rule otherwise would afford residents of this state who reside in multifamily apartments less a measure of privacy protected by the fourth amendment than their more well-off neighbors." The trial court stated further: "It would also allow law enforcement to troll through the hallways of apartment buildings, including public housing projects, with drug sniffing dogs to search for contraband within individual apartments .... Such arbitrary and unfettered
 discretion is assuredly repugnant to the fourth amendment." (Citation omitted.) Thereafter, the trial court granted the defendant's motion to dismiss the charges against him on the ground that none of the state's evidence would be admissible at a trial.
 

 III
 

 ANALYSIS UNDER ARTICLE FIRST, § 7, OF THE CONNECTICUT CONSTITUTION
 

 On appeal, the state reasserts its contention that the canine sniff of the defendant's front door and the hallway adjacent thereto was not a search under article first, § 7, because the defendant had no reasonable expectation of privacy in the area searched or in the contraband inside his home. We are not persuaded by the state's argument.
 

 It is well established that this court, in determining whether the police conducted a search under article first, § 7, "employ[s] the same analytical framework that would be used under the federal constitution .... Specifically, we ask whether the defendant has established that he had a reasonable expectation of privacy in the area or thing searched."
 
 [6]
 
 (Citations omitted; internal quotation marks omitted.)
 

 State
 
 v.
 
 Davis
 
 ,
 
 283 Conn. 280
 
 , 310,
 
 929 A.2d 278
 
 (2007). In the absence of "such
 an expectation, the subsequent police action has no constitutional ramifications .... The determination of whether such an expectation exists is to be made on a [case-by-case] basis ... and requires a [two part] inquiry: first, whether the individual has exhibited an actual subjective expectation of privacy, and, second, whether that expectation is one society recognizes as reasonable .... Whether a defendant's actual expectation of privacy in a particular place is one that society is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances ....
 

 "The determination that a particular place is protected under [article first, § 7] requires that it be one in which society is prepared, because of its code of values and its notions of custom and civility, to give deference to a manifested expectation of privacy .... It must be one that society is prepared to recognize as reasonable .... Legitimate expectations of privacy derive from concepts of real or personal property law or [from] understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others ... and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude .... Of course, one need not have an untrammeled power to admit and exclude in order to claim the protection of [article first, § 7, as] long as the place involved is one affording an expectation of privacy that society regards as reasonable."
 
 [7]
 
 (Citations omitted; internal quotation
 marks omitted.)
 
 State
 
 v.
 
 Mooney
 
 ,
 
 218 Conn. 85
 
 , 94-96,
 
 588 A.2d 145
 
 , cert. denied,
 
 502 U.S. 919
 
 ,
 
 112 S.Ct. 330
 
 ,
 
 116 L.Ed.2d 270
 
 (1991).
 

 Additional principles guide our analysis of the state's claim, chief among
 them the bedrock principle that "[p]rivacy expectations are ... highest and are accorded the strongest constitutional protection in the case of a private home and the area immediately surrounding it."
 
 State
 
 v.
 
 Brown
 
 ,
 
 198 Conn. 348
 
 , 356-57,
 
 503 A.2d 566
 
 (1986) ; see also
 
 Bozrah
 
 v.
 
 Chmurynski
 
 ,
 
 303 Conn. 676
 
 , 690,
 
 36 A.3d 210
 
 (2012) ("[n]owhere are expectations of privacy greater than in the home" [internal quotation marks omitted] ). It is also axiomatic "that a search or seizure conducted without a warrant issued upon probable cause is presumptively unreasonable. Our constitutional preference for warrants is overcome only in specific and limited circumstances." (Citations omitted; internal quotation marks omitted.)
 
 State
 
 v.
 
 Waz
 
 , supra,
 
 240 Conn. at
 
 374 n.16,
 
 692 A.2d 1217
 
 ; see also
 
 State
 
 v.
 
 Miller
 
 ,
 
 227 Conn. 363
 
 , 382,
 
 630 A.2d 1315
 
 (1993) ("[t]his court's precedents involving the state constitution's warrant requirement express a strong policy in favor of warrants").
 

 Finally, "[i]n determining the contours of the protections provided by our state constitution, we employ a multifactor approach that we first adopted in [
 
 State
 
 v.
 
 Geisler
 
 ,
 
 222 Conn. 672
 
 , 685,
 
 610 A.2d 1225
 
 (1992) ]. The factors that we consider are (1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of [the] constitutional [framers]; and (6) contemporary understandings of applicable economic and sociological norms [otherwise described as public policies] .... We have noted, however, that these factors may be inextricably interwoven, and not every [such] factor is relevant in all cases." (Citations omitted; internal quotation marks omitted.)
 
 State
 
 v.
 
 Skok
 
 ,
 
 318 Conn. 699
 
 , 708,
 
 122 A.3d 608
 
 (2015). In the present case, "our adjudication of the defendant's state constitutional claim is informed principally by those federal and sister state cases involving the use of a trained narcotics detection dog."
 
 [8]
 

 State
 
 v.
 
 Waz
 
 , supra,
 
 240 Conn. at 374
 
 ,
 
 692 A.2d 1217
 
 . We also consider whether the distinction that the state would have us draw under article first, § 7, between the front door of a single-family residence and that of a home located in a multiunit building finds support in our own case law or public policies of this state. With these principles in mind, we turn to the relevant federal precedent.
 

 On balance, we believe that federal precedent provides support for the defendant's claim of a state constitutional violation. As we previously noted, the Second Circuit Court of Appeals decided more than thirty years ago that a canine sniff of the common hallway of a multiunit apartment building, for the purpose of detecting drugs inside one of the apartments, constitutes a search within the meaning of the fourth amendment.
 
 United States
 
 v.
 
 Thomas
 
 , supra,
 
 757 F.2d at 1367
 
 .
 
 Thomas
 
 not only remains good law in the Second Circuit; see
 
 United States
 
 v.
 
 Hayes
 
 ,
 
 551 F.3d 138
 
 , 144 (2d Cir. 2008) (distinguishing
 
 Thomas
 
 but reaffirming that canine sniff of apartment door in multiunit apartment building is subject to constraints of fourth amendment); but it has been strengthened by recent federal precedent. See
 
 United States
 
 v.
 
 Whitaker
 
 ,
 
 820 F.3d 849
 
 , 852-54 (7th Cir. 2016) (reasonable expectation of
 privacy in home prohibits canine sniff of apartment door in multiunit building); and presumptively carries particular weight with this court.
 
 [9]
 
 Although the United States Supreme Court has never resolved the issue decided in
 
 Thomas
 
 ,
 
 [10]
 
 we agree with the trial court that
 
 Kyllo
 
 and
 
 Jardines
 
 tend to favor the defendant's position. In
 
 Kyllo
 
 , federal agents suspected that the petitioner, Danny Kyllo, was growing marijuana inside his home in a three-family residence.
 
 Kyllo
 
 v.
 
 United States
 
 , supra,
 
 533 U.S. at 29
 
 ,
 
 121 S.Ct. 2038
 
 . During their investigation, the agents "used an Agema Thermovision 210 thermal imager to scan the [three-family residence] .... The scan ... showed that the roof over the garage and a side wall of [Kyllo's unit] were relatively hot compared to the rest of the home and substantially warmer than neighboring homes in the [three-family residence]."
 
 Id., at 29-30
 
 ,
 
 121 S.Ct. 2038
 
 . On the basis of this information and certain other facts, the agents obtained a warrant to search Kyllo's unit and there discovered more than 100 marijuana plants growing under grow lights.
 
 Id., at 30
 
 ,
 
 121 S.Ct. 2038
 
 .
 

 After the Ninth Circuit Court of Appeals upheld the trial court's denial of Kyllo's motion to suppress; see
 
 id., at 30-31
 
 ,
 
 121 S.Ct. 2038
 
 ; the United States Supreme Court granted Kyllo's petition for a writ of certiorari and reversed.
 
 Id., at 31, 41
 
 ,
 
 121 S.Ct. 2038
 
 . In doing so, the court began its discussion of the government's claim by noting that, "[a]t the very core of the [f]ourth [a]mendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion .... With few exceptions, the question whether a warrantless
 search of a home is reasonable and [thus] constitutional must be answered no." (Citation omitted; internal quotation marks omitted.)
 
 Id., at 31
 
 ,
 
 121 S.Ct. 2038
 
 . It then explained that "[t]he ... case involves officers on a public street engaged in more than [naked eye] surveillance of a
 home. [The court has] previously reserved judgment as to how much technological enhancement of ordinary perception from such a vantage point, if any, is too much. [Although the court had] upheld enhanced aerial photography of an industrial complex in
 
 Dow Chemical
 
 [
 
 Co.
 
 v.
 
 United States
 
 ,
 
 476 U.S. 227
 
 , 234-35, 239,
 
 106 S.Ct. 1819
 
 ,
 
 90 L.Ed.2d 226
 
 (1986) ] ... [the court] found it important that [the searched area was]
 
 not
 
 an area immediately adjacent to a private home, where privacy expectations are most heightened ...." (Citation omitted; emphasis in original; internal quotation marks omitted.)
 
 Kyllo
 
 v.
 
 United States
 
 , supra,
 
 533 U.S. at 33
 
 ,
 
 121 S.Ct. 2038
 
 . "[O]btaining by [sense enhancing] technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area ... constitutes a search-at least [when, as in
 
 Kyllo
 
 ] the technology in question is not in general public use. This assures preservation of that degree of privacy against government that existed when the [f]ourth [a]mendment was adopted. On the basis of this criterion, the information obtained by the thermal imager ... was the product of a search." (Citation omitted; internal quotation marks omitted.)
 
 Id., at 34-35
 
 ,
 
 121 S.Ct. 2038
 
 .
 

 In reaching its conclusion, the court rejected the government's contention that the thermal imaging was not a search because it did not reveal "private activities occurring in private areas ...." (Citation omitted; internal quotation marks omitted.)
 
 Id., at 37
 
 ,
 
 121 S.Ct. 2038
 
 . As the court explained, "[t]he [f]ourth [a]mendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained .... In the
 home ...
 
 all
 
 details are intimate details, because the entire area is held safe from prying government eyes." (Emphasis in original.)
 
 Id.
 
 After observing that the thermal imager could detect lawful activity, even intimate details such as "at what hour each night the lady of the house takes her daily sauna and bath";
 
 id., at 38
 
 ,
 
 121 S.Ct. 2038
 
 ; the court concluded: "[T]he [f]ourth [a]mendment draws a firm line at the entrance to the house .... That line ... must be not only firm but also bright-which requires clear specification of those methods of surveillance that require a warrant. [Although] it is certainly possible to conclude from the ... thermal imaging [scan] ... that no significant compromise of the homeowner's privacy ha[d] occurred, [the court] must take the long view ... from the original meaning of the [f]ourth [a]mendment forward." (Citation omitted; internal quotation marks omitted.)
 
 Id., at 40
 
 ,
 
 121 S.Ct. 2038
 
 . When, as in
 
 Kyllo
 
 , "the [g]overnment uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a search and is presumptively unreasonable without a warrant." (Internal quotation marks omitted.)
 
 Id.
 

 More recently, in
 
 Jardines
 
 , the court was asked to decide "whether using a [drug sniffing] dog on a homeowner's porch to investigate the contents of the home is a search within the meaning of the [f]ourth [a]mendment." (Internal quotation marks omitted.)
 
 Florida
 
 v.
 
 Jardines
 
 , supra,
 
 133 S.Ct. at 1413
 
 . In that case, the police received a tip that the respondent, Joelis Jardines, was growing marijuana inside his single-family residence.
 
 Id.
 
 On the basis of that information, a police drug detection dog and his handler were dispatched to Jardines' home to conduct a sniff test of the exterior of the residence.
 
 Id.
 
 As the court explained, "[t]he dog was trained to detect the scent of marijuana, cocaine, heroin, and several other drugs, indicating the presence of
 any of these substances through particular behavioral
 changes recognizable by his handler." Id."As the dog approached Jardines' front porch, he apparently sensed one of the odors he had been trained to detect, and began energetically exploring the area for the strongest point source of that odor." Id."After sniffing the base of the front door, the dog sat, which is the trained behavior [that the dog exhibits when he discovers] the odor's strongest point."
 
 Id.
 
 On the basis of the dog's reaction, the police obtained a warrant to search Jardines' residence, where they found several marijuana plants.
 
 Id.
 

 Jardines was charged with trafficking in cannabis and later moved to suppress the evidence seized from his home on the ground that the officers' use of a dog to detect drugs inside the home violated the fourth amendment. See
 
 id.
 
 The trial court agreed and granted the motion. See
 
 id.
 
 That judgment, however, was reversed by the Florida District Court of Appeal, whose judgment, in turn, was reversed by the Florida Supreme Court. See
 
 id.
 
 The United States Supreme Court then granted Florida's petition for a writ of certiorari; see
 
 id.,
 
 at 1414 ; "limited to the question of whether the officers' behavior was a search within the meaning of the [f]ourth [a]mendment."
 
 Id.
 
 The court concluded that it was.
 
 Id., at 1417-18
 
 .
 

 In doing so, however, the court did not apply the reasonable expectation of privacy test recognized in
 
 Katz
 
 , as it did in
 
 Kyllo
 
 , but opted instead to view the matter through a common-law property lens. See
 
 id., at 1414
 
 . The court explained: "The [fourth] [a]mendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When the [g]overnment obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the [f]ourth [a]mendment has undoubtedly occurred." (Internal
 quotation marks omitted.) Id."That principle renders this case a straightforward one. The officers were gathering information in an area belonging to Jardines and immediately surrounding his house-in the curtilage of the house, which [the court has] held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner."
 
 Id.
 

 Having determined that the officers intruded on constitutionally protected curtilage, the court next considered whether Jardines "had given his leave (even implicitly) for them to do so."
 
 Id., at 1415
 
 . The court concluded that he had not, stating in relevant part: "[The court has] ... recognized that the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds .... This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the [n]ation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do ....
 

 "But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome);
 

 to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound
 into the garden before saying hello and asking permission, would inspire most of us to ... call the police. The scope of a license-express or implied-is limited not only to a particular area but also to a specific purpose .... Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search." (Citations omitted; emphasis omitted; footnotes omitted; internal quotation marks omitted.)
 
 Id.,
 
 at1415-16.
 
 [11]
 

 In a concurring opinion joined by Justices Ginsburg and Sotomayor, Justice Kagan explained that she "could just as happily have decided [the case] by looking to Jardines' privacy interests."
 
 Id., at 1418
 
 (Kagan, J., concurring). Such a decision, she asserted, would have looked very much like the majority opinion. See
 
 id., at 1418-19
 
 (Kagan, J., concurring) "It would have talked about the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion .... It would have insisted on maintaining the practical value of that right by preventing police officers from standing in an adjacent space and trawl[ing] for evidence with impunity .... It would have explained that privacy expectations are most heightened in the home and the surrounding area .... And it would have determined that police officers invade those shared expectations when they use trained canine assistants to reveal within the confines of a home what they could not otherwise have found there." (Citations omitted; internal quotation marks omitted.)
 
 Id.
 

 Justice Kagan also explained that "the sentiment 'my home is my own,' while originating in property law, now also denotes a common understanding-extending even beyond that law's formal protections-about an especially private sphere. Jardines' home was his property; it was also his most intimate and familiar space. The analysis proceeding from each of those facts ... runs mostly along the same path.
 

 "I can think of only one divergence: If [the court] had decided this case on privacy grounds, [it] would have realized that
 
 Kyllo
 
 ... already resolved it. The [court in]
 
 Kyllo
 
 ... held that police officers conducted a search when they used a [thermal imaging] device to detect heat emanating from a private home, even though they committed no trespass. Highlighting [the court's] intention to draw both a 'firm' and a 'bright' line at 'the entrance to the house' ... [it] announced the following rule:
 

 " 'Where, as here, the [g]overnment uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a "search" and is presumptively unreasonable without a warrant.' ...
 

 "That 'firm' and 'bright' rule governs this case: The police officers ... conducted a search because they used a 'device ... not in general public use' (a trained [drug detection] dog) to 'explore details of the home' (the presence of certain substances) that they would not otherwise have discovered without entering the premises." (Citations omitted; footnote
 omitted.)
 
 Id., at 1419
 
 (Kagan, J., concurring). At the very least, therefore,
 
 Jardines
 
 makes clear that warrantless canine sniffs of the home are frequently unconstitutional. Justice Kagan's concurrence suggests that they are, in fact,
 
 never
 
 constitutional-at least in the absence of exigent circumstances.
 

 Since
 
 Jardines
 
 , only one federal circuit court of appeals has considered whether a canine sniff of an apartment door in a multiunit apartment building, for the purpose of detecting drugs inside of the apartment, constitutes a search under the fourth amendment. See
 
 United States
 
 v.
 
 Whitaker
 
 , supra,
 
 820 F.3d at 850
 
 . In that case, the Seventh Circuit concluded that it was a search.
 
 Id., at 854
 
 . The facts of
 
 Whitaker
 
 are no different from the facts in the present case: "Acting on information that drugs were being sold from a certain apartment in Madison, Wisconsin, law enforcement obtained the permission of the apartment property manager [to bring] a [narcotics detecting] dog to the locked, shared hallway of the apartment building. The dog alerted to the presence of drugs at a nearby apartment door and then went to the targeted apartment where [the defendant, Lonnie] Whitaker, was residing. After the officers obtained a search warrant, Whitaker was arrested and charged with drug and firearm crimes based on evidence found in the apartment."
 
 Id., at 850
 
 .
 

 Whitaker moved to suppress the evidence seized from his apartment, arguing, inter alia, that the use of the dog to detect contraband inside his home was a search under the fourth amendment and
 
 Jardines
 
 .
 
 Id.,
 
 at 851 ; see
 
 id., at 850, 852
 
 . After the trial court denied his motion, Whitaker entered a conditional guilty plea, reserving his right to appeal from the trial court's ruling.
 
 Id., at 850
 
 . On appeal, "Whitaker argue[d] that
 
 Jardines
 
 should be extended to the hallway outside his apartment door because ... law enforcement took the dog to his door for the purpose of gathering incriminating forensic evidence."
 
 Id., at 852
 
 . Recognizing, however, "that
 
 Jardines
 
 was premised on trespass to property, he also argue[d] that this use of a [drug detection] dog violated his privacy interests under
 
 Kyllo
 
 ... and
 
 Katz
 
 ...." (Citations
 omitted.)
 
 Id.
 
 The Seventh Circuit agreed with the latter contention, stating in relevant part: "The use of a [drug sniffing] dog ... clearly invaded reasonable privacy expectations, as ... Justice [Kagan explained in her] concurring opinion in
 
 Jardines
 
 . The police in
 
 Jardines
 
 could reasonably and lawfully walk up to the front door of the house in that case to knock on the door and ask to speak to the residents. The police were not entitled, however, to bring a '[super sensitive] instrument' to detect objects and activities that they could not perceive without its help .... The police could not stand on the front porch and look inside with binoculars or put a stethoscope to the door to listen. Similarly, they could not bring the [super sensitive] dog to detect objects or activities inside the home. As Justice Kagan explained, viewed through a privacy lens,
 
 Jardines
 
 was controlled by
 
 Kyllo
 
 , which held that police officers conducted a search by using a [thermal imaging] device to detect heat emanating from within the home, even without trespassing on the property." (Citations omitted.)
 
 Id., at 852-53
 
 . The Seventh Circuit concluded that "[a] dog [sniff] conducted from an apartment hallway comes within this rule's ambit."
 
 Id., at 853
 
 .
 

 The Seventh Circuit noted, moreover, just as the Second Circuit did in
 
 Thomas
 
 , that "the fact that this was a search of a home distinguishes this case from dog sniffs in public places in
 
 United States
 
 v.
 
 Place
 
 , [supra,
 
 462 U.S. at 698
 
 ,
 
 103 S.Ct. 2637
 
 ] (luggage at airport), and
 
 Illinois
 
 v.
 
 Caballes
 
 , [supra,
 
 543 U.S. at 406
 
 ,
 
 125 S.Ct. 834
 
 ] (traffic stop). Neither case implicated the [f]ourth [a]mendment's core concern of protecting the privacy of the home. It is true that Whitaker did not have a reasonable expectation of complete privacy in his apartment hallway .... [But] Whitaker's lack of a reasonable expectation of complete privacy in the hallway does not also mean that he had no reasonable expectation of privacy against persons in the hallway snooping into his apartment using sensitive
 devices not available to the general public." (Citation omitted.)
 
 United States
 
 v.
 
 Whitaker
 
 , supra,
 
 820 F.3d at 853
 
 .
 

 Even more recently, in
 
 United States
 
 v.
 
 Hopkins
 
 ,
 
 824 F.3d 726
 
 , 729, 731-33 (8th Cir. 2016), cert. denied, --- U.S. ----,
 
 137 S.Ct. 522
 
 ,
 
 196 L.Ed.2d 425
 
 (
 
 85 U.S.L.W. 3260
 
 , November 28, 2016 ), the Eighth Circuit Court of Appeals considered the closely related question of whether a canine sniff of the front door of a two-story townhouse violated the fourth amendment as interpreted in
 
 Jardines
 
 and
 
 Kyllo
 
 . In
 
 Hopkins
 
 , the townhouse in question shared a common walkway and front stoop with the unit next door. See id., at 729-30. Unlike the court in
 
 Whitaker
 
 , which applied
 
 Katz
 
 ' reasonable expectation of privacy test, the Eighth Circuit followed the trespass to property approach utilized in
 
 Jardines
 
 . See id., at 731-33. In doing so, the court explained that, under
 
 Jardines
 
 , "the front porch area [is] a classic exemplar of curtilage, the area immediately surrounding and associated with the home .... Although ... officers [have] an implicit license to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave, they [have] no invitation to introduc[e] a trained police dog to explore the area around the home in hopes of discovering incriminating evidence." (Citation omitted; internal quotation marks omitted.) Id., at 731. The court then explained that a determination of "whether a particular area is part of the curtilage of an individual's residence requires consideration of [four] factors that bear [on] whether an individual reasonably may expect that the area in question should be treated as the home itself." (Internal quotation marks omitted.) Id. Those factors, which are set forth in
 
 United States
 
 v.
 
 Dunn
 
 ,
 
 480 U.S. 294
 
 , 301,
 
 107 S.Ct. 1134
 
 ,
 
 94 L.Ed.2d 326
 
 (1987), include "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the
 area is put, and the steps taken by the resident to protect the area from observation by people passing by." (Internal quotation marks omitted.)
 
 United States
 
 v.
 
 Hopkins
 
 , supra, at 731.
 

 Citing the canine handler's testimony that the dog had come within "six to eight inches" of the door and "actually sniffed the creases of the door"; (internal quotation marks omitted) id., at 732 ; and noting that "[t]he area within [one] foot of the only door to the [townhouse] would be used every day by its residents as they came and went"; id. ; the court concluded that the first and third
 
 Dunn
 
 factors were met and, therefore, that the area in question was curtilage. See id. The court did determine that the second and fourth
 
 Dunn
 
 factors were not met, but it noted that the same was true in
 
 Jardines
 
 , and the United States Supreme Court still determined that the front porch in that case was curtilage. See id.
 

 Because we address the state's claim under the state constitution, we need not decide whether a canine sniff of an apartment door inside a multiunit building violates the fourth amendment. In the absence of significant precedent to the contrary of which we are unaware, however, and despite conflicting court decisions,
 we agree with the defendant that the better reasoned federal case law concerning the propriety of residential canine sniffs under the fourth amendment supports the defendant's position in this case. This is true whether the defendant's claim is reviewed under the
 
 Katz
 
 line of privacy based decisions or under the principles of curtilage on which the court in
 
 Jardines
 
 relied and that the Eighth Circuit applied in
 
 Hopkins
 
 .
 

 The state cites several federal cases for the proposition that the canine sniff of the defendant's front door was not a search because "there 'exists no generalized expectation of privacy in the common areas of an apartment
 building,' which [include] a 'common hallway.' "
 
 [12]
 
 "This jurisprudence," the state argues, "is consistent with United States Supreme Court decisions that have accorded apartments the status of 'homes' for fourth amendment purposes, but not the 'adjoining common hallways.'
 
 United States
 
 v.
 
 Holland
 
 ,
 
 755 F.2d 253
 
 , 255 (2d Cir.), cert. denied,
 
 471 U.S. 1125
 
 , [
 
 105 S.Ct. 2657
 
 ,
 
 86 L.Ed.2d 274
 
 ] (1985)."
 We agree with the trial court that the state's reliance on these cases, most of which predate both
 
 Jardines
 
 and
 
 Kyllo
 
 , is misplaced because all of them involve searches of the common areas themselves, or arrests made in those areas, rather than searches of apartments using the common areas as a place from which to launch a search. See, e.g.,
 
 United States
 
 v.
 
 Holland
 
 , supra,
 
 755 F.2d at 255-57
 
 (defendant's arrest in common vestibule of apartment building was lawful because defendant had no reasonable expectation of privacy in that area);
 
 United States
 
 v.
 
 Kelly
 
 ,
 
 551 F.2d 760
 
 , 763 (8th Cir.) (evidence found under common stairwell of apartment
 building was admissible at trial because defendant had no reasonable expectation of privacy in that area), cert. denied,
 
 433 U.S. 912
 
 ,
 
 97 S.Ct. 2981
 
 ,
 
 53 L.Ed.2d 1097
 
 (1977), and cert. denied sub nom.
 
 Powell
 
 v.
 
 United States
 
 ,
 
 433 U.S. 912
 
 ,
 
 97 S.Ct. 2981
 
 ,
 
 53 L.Ed.2d 1097
 
 (1977).
 
 [13]
 
 The issue the courts were required to determine in these cases was simply whether the defendant's expectation of privacy in the common areas was sufficient to require that the police obtain a warrant prior to entering or conducting a search of those areas.
 
 Holland
 
 , a Second Circuit case cited throughout the state's brief, illustrates why the state's reliance on these cases is unwarranted.
 In
 
 Holland
 
 , a police officer rang the doorbell for the apartment occupied by the defendant, Mose Holland, from "the ground floor entranceway" to the building's common hallway, and, when Holland arrived in the vestibule and opened the door, the police officer drew his gun and arrested him.
 
 United States
 
 v.
 
 Holland
 
 , supra,
 
 755 F.2d at 254
 
 . The Second Circuit Court of Appeals declined "to treat this as a 'threshold' case"; instead, the court assumed that the arrest "took place in the vestibule or hallway ...."
 
 Id., at 255
 
 . In concluding that the arrest was lawful, the court relied on the "[commonsense] distinction between places of abode, such as apartments, and common hallways," which "are not within an individual tenant's zone of privacy ...."
 
 Id.
 
 That the state relies on
 
 Holland
 
 is curious in light of the Second Circuit's nearly simultaneous ruling in
 
 United States
 
 v.
 
 Thomas
 
 , supra,
 
 757 F.2d at 1367
 
 , that a canine sniff of a person's front door in a multiunit apartment building
 
 is
 
 indeed a search because of the heightened expectation of privacy in the home. Therefore, the Second Circuit's jurisprudence distinguishes between the invasion of a common area itself and the use of a common area to invade an adjacent private area. As that court aptly recognized, a person may lack a reasonable expectation of privacy in the common areas of an apartment building without sacrificing the privacy interest inherent in his home. See
 
 id.
 

 The state also cites three federal district court cases that conclude that a canine sniff of the hallway adjacent to an apartment in a multiunit apartment building is not a search, in part because the resident lacked a reasonable expectation of privacy in the common areas of the building. See
 
 United States
 
 v.
 
 Mathews
 
 , United States District Court, Docket No. 13-79 (ADM/AJB) (D. Minn. October 25, 2013) ("[b]ecause they are shared by multiple tenants, no reasonable expectation of privacy arises in such common areas"), aff'd on other grounds,
 
 784 F.3d 1232
 
 (8th Cir. 2015) ;
 
 United States
 
 v.
 
 Penaloza-Romero
 
 , United States District Court, Docket No. 13-36 (RHK/TNL),
 
 2013 WL 5472283
 
 (D. Minn. September 30, 2013)
 ("[T]he dog sniff occurred in a common hallway of an apartment building. Without an expectation of privacy in the hallway, it cannot have the same constitutional protections as the curtilage around a house.");
 
 United States
 
 v.
 
 Broadway
 
 ,
 
 580 F.Supp.2d 1179
 
 , 1193 (D. Colo. 2008) ("[The] [d]efendant argues [that the apartment building groundskeeper] did not have the authority to allow [the police detective] into the secure hallway .... '[A] tenant lacks a reasonable expectation of privacy in the common areas of an apartment building.' "). For a number of reasons, these cases are unpersuasive. First, two of them are from the Eighth Circuit, which has explicitly reserved judgment on the application of
 
 Jardines
 
 to apartments in multiunit buildings. See
 
 United States
 
 v.
 
 Mathews
 
 ,
 
 784 F.3d 1232
 
 , 1235 (8th Cir.) (declining to reach question of whether
 
 Jardines
 
 "cast [s] doubt on ... earlier cases [in the Eighth Circuit] sanctioning the use of a drug dog to sniff around the door of an apartment in the common hallway of an apartment building ... because it was objectively reasonable at the time for police to rely on binding circuit precedent permitting such drug dog sniffs," and, under
 
 Davis
 
 v.
 
 United States
 
 ,
 
 564 U.S. 229
 
 , 232,
 
 131 S.Ct. 2419
 
 ,
 
 180 L.Ed.2d 285
 
 [2011], "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule" [internal quotation marks omitted] ), cert. denied sub nom.
 
 Matthews
 
 v.
 
 United States
 
 , --- U.S. ----,
 
 136 S.Ct. 376
 
 ,
 
 193 L.Ed.2d 303
 
 (2015). Furthermore, insofar as the court in
 
 Broadway
 
 addressed the issue, that court determined simply that a tenant could not reasonably expect police officers not to be present in the common hallway in question. See
 
 United States
 
 v.
 
 Broadway
 
 , supra, at 1194 ("[i]f actual authority is established, the person whose
 property is searched is unjustified in claiming an expectation of privacy in the property because that person cannot reasonably believe that the joint user will not, under certain circumstances, allow a search in her own right" [internal quotation marks omitted] ). In
 
 Broadway
 
 , a detective was admitted into an apartment complex by a groundskeeper who had at least apparent authority to do so, and the court determined that the groundskeeper's consent vitiated any expectation of privacy on the part of the defendant. See id. ; see also
 
 United States
 
 v.
 
 Brock
 
 ,
 
 417 F.3d 692
 
 , 697 (7th Cir. 2005) ("[c]ritical to our holding that the dog sniff in this case was not a [f]ourth [a]mendment search is the fact that [the] police were lawfully present inside the common areas of the residence with the consent of [the defendant's] roommate"). As we observed previously, however, the question of lawful physical presence is distinct from the question of whether a canine sniff of the exterior of a person's home impermissibly invades reasonable expectations of privacy in the home.
 

 The state also argues that the canine sniff was not a search under the state constitution because the defendant had no reasonable expectation of privacy in any contraband inside his condominium. Relying on the reasoning of
 
 United States
 
 v.
 
 Place
 
 , supra,
 
 462 U.S. at 707
 
 ,
 
 103 S.Ct. 2637
 
 , and
 
 Illi
 

 n
 

 o
 

 is
 
 v.
 
 Caballes
 
 , supra,
 
 543 U.S. at 408-409
 
 ,
 
 125 S.Ct. 834
 
 , that the canine sniffs at issue in those cases were not searches for purposes of the fourth amendment because a canine sniff reveals only contraband in which an individual has no legitimate expectation of privacy, the state maintains that this logic applies equally to the present case. The state also observes that
 
 Place
 
 and
 
 Caballes
 
 are in no way inconsistent with or undermined by
 
 Kyllo
 
 , for, as the court itself explained in
 
 Caballes
 
 , "[c]ritical to [this court's] decision [in
 
 Kyllo
 
 ] was the fact that the [thermal imaging] device was capable of
 detecting lawful activity";
 
 id.
 
 ; and "[t]he legitimate expectation
 that information about perfectly lawful activity will remain private is categorically distinguishable from [an individual's] hopes or expectations concerning the non-detection of contraband in the trunk of his car."
 
 Id., at 410
 
 ,
 
 125 S.Ct. 834
 
 .
 
 [14]
 
 According to the state, because a canine sniff reveals only contraband, it is not a search, even if it is directed at the home.
 

 Although we ultimately disagree with the state's contention that the present case is controlled by
 
 Place
 
 and
 
 Caballes
 
 , we acknowledge that the state's fourth amendment analysis does find support in a number of federal and sister state cases. These cases hold that, whatever the extent of privacy rights otherwise pertaining to common hallways in multitenant buildings, a canine sniff of an apartment building or other residence is not a search because it discloses only the existence of contraband.
 
 [15]
 
 See, e.g.,
 
 United States
 
 v.
 
 Scott
 
 ,
 
 610 F.3d 1009
 
 , 1016 (8th Cir. 2010), cert. denied,
 
 562 U.S. 1160
 
 ,
 
 131 S.Ct. 964
 
 ,
 
 178 L.Ed.2d 794
 
 (2011) ;
 
 United States
 
 v.
 
 Brock
 
 , supra,
 
 417 F.3d at
 
 696 ;
 
 United States
 
 v.
 
 Anthony
 
 , United States District Court, Docket No. 11-68,
 
 2012 WL 959448
 
 (JBS) (D.N.J. March 20, 2012) ;
 
 United States
 
 v.
 
 Broadway
 
 , supra,
 
 580 F.Supp.2d at
 
 1190 ;
 
 State
 
 v.
 
 Nguyen
 
 ,
 
 841 N.W.2d 676
 
 , 681 (N.D. 2013), cert. denied, --- U.S. ----,
 
 135 S.Ct. 2888
 
 ,
 
 192 L.Ed.2d 924
 
 (2015). Although the continued vitality of the reasoning of the Seventh and Eighth Circuit cases has been called into question by subsequent decisions of those courts; see
 
 United States
 
 v.
 
 Hopkins
 
 , supra,
 
 824 F.3d at
 
 731-33
 Eighth Circuit Court of Appeals);
 
 United States
 
 v.
 
 Whitaker
 
 , supra,
 
 820 F.3d at 852-54
 
 (Seventh Circuit Court of Appeals); several other cases generally support the state's argument. For example, as the court in
 
 Anthony
 
 explained: "The legal premise that governmental conduct that only reveals the possession of contraband compromises no legitimate privacy interest ... is not, on its face, a [fact specific] judgment with respect to cars or luggage-or really even a judgment about privacy expectations; it is a judgment about the legitimacy of hiding contraband. From this perspective, there is no reason why governmental conduct that only reveals the possession of contraband in a house should be different from governmental conduct that only reveals the possession of contraband in the trunk of a car, because the reason for not affording contraband [f]ourth [a]mendment privacy protection has nothing to do with expectations of what will remain private, and everything to do with what society is prepared to accept as legitimate privacy." (Internal quotation marks omitted.)
 
 United States
 
 v.
 
 Anthony
 
 , supra. Consistent with this reasoning, the court concluded that a canine sniff of an apartment from the hallway of a multifamily residence, at least when "nothing in the record calls into question the factual premise that nothing is revealed other than possession of contraband by a dog sniff," is not a search under the fourth amendment. Id. ; see also
 
 United States
 
 v.
 
 Broadway
 
 , supra, at 1191 ("as long as the canine unit is lawfully
 present when the sniff occurs, the canine sniff is not a search within the meaning of the [f]ourth [a]mendment" [internal quotation marks omitted] ).
 

 We acknowledge that, in
 
 Place
 
 and, more recently, in
 
 Caballes
 
 , the United States Supreme Court employed reasoning that supports the conclusion that a canine sniff is not a search under the fourth amendment because that investigative technique reveals only the
 existence of contraband, and one's subjective expectation of privacy in contraband is not objectively reasonable. See
 
 Illinois
 
 v.
 
 Caballes
 
 , supra,
 
 543 U.S. at 408-10
 
 ,
 
 125 S.Ct. 834
 
 (canine sniff of motor vehicle does not implicate fourth amendment because there can be no expectation of privacy in contraband that society deems reasonable);
 
 United States
 
 v.
 
 Place
 
 , supra,
 
 462 U.S. at 707
 
 ,
 
 103 S.Ct. 2637
 
 (canine sniff of luggage at public airport is not search within meaning of fourth amendment, in part because it discloses only presence or absence of contraband). Nevertheless, we believe that
 
 Place
 
 and
 
 Caballes
 
 are distinguishable from the present case because a canine sniff of a residence is entitled to significantly more protection than a canine sniff of an automobile or a piece of luggage at a public airport. Both this court and the United States Supreme Court have drawn a bright line around the home. Indeed, the United States Supreme Court has held "over and over again ... that people's expectations of privacy are much lower in their cars than in their homes";
 
 Florida
 
 v.
 
 Jardines
 
 , supra,
 
 133 S.Ct. at
 
 1419 n.1 (Kagan, J., concurring); and, as the Second Circuit Court of Appeals observed in
 
 Thomas
 
 , "[a] practice that is not intrusive in a public airport may be intrusive when employed at a person's home."
 
 United States
 
 v.
 
 Thomas
 
 , supra,
 
 757 F.2d at 1366
 
 . This is because "[t]he very fact that a person is in his own home raises a reasonable inference that he intends to have privacy, and if that inference is borne out by his actions, society is prepared to respect his privacy."
 
 Id.,
 
 quoting
 
 United States
 
 v.
 
 Taborda
 
 ,
 
 635 F.2d 131
 
 , 138 (2d Cir. 1980). Indeed, this respect for the sanctity of the home is at the "very core" of the fourth amendment; (internal quotation marks omitted)
 
 Florida
 
 v.
 
 Jardines
 
 , supra, at 1414 ; and is "well established ... in our [state's] jurisprudence."
 
 State
 
 v.
 
 Geisler
 
 , supra,
 
 222 Conn. at 687
 
 ,
 
 610 A.2d 1225
 
 ; see also
 
 State
 
 v.
 
 Bernier
 
 ,
 
 246 Conn. 63
 
 , 75,
 
 717 A.2d 652
 
 (1998) ("the right to be secure in one's home is central
 to the prohibition of article first, § 7, of the state constitution, against unreasonable intrusions by the state");
 
 State
 
 v.
 
 Brown
 
 , supra,
 
 198 Conn. at 356-57
 
 ,
 
 503 A.2d 566
 
 ("[p]rivacy expectations are normally highest and are accorded the strongest constitutional protection in the case of a private home and the area immediately surrounding it").
 

 Furthermore, this distinction between searches of the home and searches of locations outside the home is consistent with the established priorities of article first, § 7, of the Connecticut constitution. As we noted in
 
 State
 
 v.
 
 Miller
 
 , supra,
 
 227 Conn. at 363
 
 ,
 
 630 A.2d 1315
 
 , Connecticut has long had a "strong policy in favor of warrants" under article first, § 7, a policy that has been held to "[provide] broader protection than the fourth amendment" in certain contexts. Id., at 382,
 
 630 A.2d 1315
 
 . Indeed, "[u]nder the state constitution, all warrantless searches, [regardless of] whether ... the police have probable cause to believe that a crime was committed, are per se unreasonable, unless they fall within one of a few specifically established and well delineated exceptions to the warrant requirement."
 
 State
 
 v.
 
 Joyce
 
 ,
 
 229 Conn. 10
 
 , 24-25,
 
 639 A.2d 1007
 
 (1994). In
 
 Joyce
 
 , we explained that the few
 "recognized exceptions" arise out of "acknowledged interests in protecting the safety of the police and the public and in preserving evidence." (Internal quotation marks omitted.) Id., at 26,
 
 639 A.2d 1007
 
 . Suffice it to say that the use of a canine sniff for drugs in response to an anonymous tip will rarely, if ever, rise to the level of urgency required by these precedents.
 

 Thus, we agree with the Seventh and Second Circuits that a resident's legitimate expectation of privacy in the home is capacious enough to preclude certain uses of the common areas immediately adjacent to the home. As the Seventh Circuit explained, the defendant's "lack of a right to exclude did not mean [that] he had no right to expect certain norms of behavior in his apartment hallway. [To be sure], other residents and their guests
 and even their dogs) can pass through the hallway. They are not entitled, though, to set up chairs and have a party in the hallway right outside the door. Similarly, the fact that a police officer might lawfully walk by and hear loud voices from inside an apartment does not mean [that] he could put a stethoscope to the door to listen to all that is happening inside."
 
 United States
 
 v.
 
 Whitaker
 
 , supra,
 
 820 F.3d at 853
 
 .
 

 In other words, a defendant's "lack of a reasonable expectation of complete privacy in the hallway does not also mean that he had no reasonable expectation of privacy against persons in the hallway snooping into his apartment using sensitive devices not available to the general public."
 
 Id.
 
 ; see also
 
 United States
 
 v.
 
 Thomas
 
 , supra,
 
 757 F.2d at 1367
 
 (finding "a legitimate expectation that the contents of [a] closed apartment would remain private, that they could not be 'sensed' from outside [the] door"). This is consonant with the United States Supreme Court's observation that the right to retreat into one's home "would be of little practical value if the [s]tate's agents could stand in a home's porch or side garden and trawl for evidence with impunity" or "if the police could enter a man's property to observe his repose from just outside the front window."
 
 Florida
 
 v.
 
 Jardines
 
 , supra,
 
 133 S.Ct. at 1414
 
 .
 

 Indeed, even if a canine sniff were to reveal nothing about the interior of the home, we believe that the underlying prohibition against unreasonable intrusions into the sanctity of the home cannot abide the public spectacle of a warrantless canine investigation of the perimeters of any home. It may well be that a canine sniff itself is "discriminating and unoffensive" when compared to other physical intrusions of the premises of a home.
 
 United States
 
 v.
 
 Thomas
 
 , supra,
 
 757 F.2d at 1367
 
 . Even so, such searches are highly visible and readily identifiable. They also hold a resident up to public scrutiny in his own home. As the Florida
 Supreme Court observed, "[s]uch a public spectacle unfolding in a residential neighborhood will invariably entail a degree of public opprobrium, humiliation and embarrassment for the resident, for such dramatic government activity in the eyes of many-neighbors, passers-by, and the public at large-will be viewed as an official accusation of crime."
 
 Jardines
 
 v.
 
 State
 
 ,
 
 73 So.3d 34
 
 , 36 (Fla. 2011), aff'd, --- U.S. ----,
 
 133 S.Ct. 1409
 
 ,
 
 185 L.Ed.2d 495
 
 (2013).
 
 [16]
 
 We also share that court's concern that, if police officers are permitted to conduct warrantless canine searches of people's homes, "there is nothing to prevent [them] from applying the procedure in an arbitrary or discriminatory manner, or based on whim
 and fancy, at the home of any citizen," and that "[s]uch an open-ended policy invites overbearing and harassing conduct."
 
 Id.
 

 In view of the foregoing, we agree with those federal courts that have distinguished canine sniffs of the home from canine sniffs of movable property. While we have previously suggested that the "heightened privacy interests that pertain to one's house" might demand a more rigorous assessment of canine sniffs than the privacy interests in movable property; see
 
 State
 
 v.
 
 Waz
 
 , supra,
 
 240 Conn. at 381
 
 ,
 
 692 A.2d 1217
 
 ; we believe that Justice Kagan's concurrence in
 
 Jardines
 
 properly applies this principle to the "[super sensitive] instrument" of a dog's nose.
 
 Florida
 
 v.
 
 Jardines
 
 , supra,
 
 133 S.Ct. at 1418
 
 (Kagan, J., concurring). As Justice Kagan observed, the sanctity of the home is not measured by the presence or absence of contraband, or even by the relative "intimacies" of the facts that may be discovered there.
 
 Id.
 
 Rather, it is measured by the " 'firm' " and " 'bright' " line at the entrance to the house.
 
 Id., at 1419
 
 (Kagan, J., concurring). Considered in this light, cases such as
 
 Caballes
 
 are not simply cases about canine sniffs; they are cases about
 canine sniffs
 
 directed at motor vehicles
 
 . See
 
 Illinois
 
 v.
 
 Caballes
 
 , supra,
 
 543 U.S. at 417
 
 ,
 
 125 S.Ct. 834
 
 (Souter, J., dissenting) (noting that majority in
 
 Caballes
 
 did "not go so far as to say explicitly that sniff searches by dogs trained to sense contraband always get a free pass under the [f]ourth [a]mendment, since it reserve[d] judgment on the constitutional significance of sniffs assumed to be more intrusive than a dog's walk around a stopped car"). Significantly, this interpretation of
 
 Caballes
 
 has been adopted by the only federal circuit court of appeals to have considered the issue of canine sniffs in a common hallway after
 
 Jardines
 
 . See
 
 United States
 
 v.
 
 Whitaker
 
 , supra,
 
 820 F.3d at
 
 853 ; see also
 
 United States
 
 v.
 
 Davis
 
 ,
 
 760 F.3d 901
 
 , 905 (8th Cir. 2014) (questioning continuing validity of earlier circuit precedent to contrary following
 
 Jardines
 
 ), cert. denied, --- U.S. ----,
 
 135 S.Ct. 996
 
 ,
 
 190 L.Ed. 2d 872
 
 (2015).
 

 Turning to precedent from other state courts, we note that only seven states appear to have addressed the issue of whether a canine sniff of an apartment door in a multiunit building is a search with constitutional implications. Five have concluded, either under the federal constitution or their respective state constitutions, that it is a search and that it requires either a reasonable, articulable suspicion or a warrant supported by probable cause. See
 
 People
 
 v.
 
 Burns
 
 ,
 
 401 Ill.Dec. 468
 
 ,
 
 50 N.E.3d 610
 
 , 613-14, 622 (2016) (under
 
 Jardines
 
 , canine sniff of apartment door in multiunit apartment building is search under fourth amendment requiring warrant supported by probable cause);
 
 State
 
 v.
 
 Davis
 
 ,
 
 732 N.W.2d 173
 
 , 181 (Minn. 2007) (under Minnesota constitution, "the police needed a reasonable, articulable suspicion to walk a [narcotics detection] dog down the common hallway outside [the defendant's] apartment");
 
 State
 
 v.
 
 Ortiz
 
 ,
 
 257 Neb. 784
 
 , 787,
 
 600 N.W.2d 805
 
 (1999) (under federal and Nebraska constitutions, "[a]lthough a canine may be deployed to test for illegal drugs in some cases,
 doing so at the threshold of [any] dwelling on less than reasonable, articulable suspicion is improper");
 
 People
 
 v.
 
 Dunn
 
 ,
 
 77 N.Y.2d 19
 
 , 25,
 
 564 N.E.2d 1054
 
 ,
 
 563 N.Y.S.2d 388
 
 (1990) (New York constitution requires reasonable, articulable suspicion before police may employ canine sniff of apartment door in multiunit apartment building), cert. denied,
 
 501 U.S. 1219
 
 ,
 
 111 S.Ct. 2830
 
 ,
 
 115 L.Ed.2d 1000
 
 (1991) ;
 
 State
 
 v.
 
 Rendon
 
 ,
 
 477 S.W.3d 805
 
 , 808 (Tex. Crim. App. 2015) (under
 
 Jardines
 
 , "the officers' conduct in bringing a trained [drug detection] dog up to the threshold or
 area immediately outside of [the defendant's apartment] door for the purpose of conducting a [canine narcotics] sniff was an 'unlicensed physical intrusion' onto the curtilage of his home that constituted a search in violation of the [f]ourth [a]mendment").
 

 In addition, the Florida Supreme Court and Washington Court of Appeals both have concluded that a canine sniff of the front door of a single-family home violates the resident's reasonable expectation of privacy in his home and therefore requires a warrant supported by probable cause. See
 
 Jardines
 
 v.
 
 State
 
 , supra,
 
 73 So.3d at 36, 49
 
 , 54 ;
 
 State
 
 v.
 
 Dearman
 
 ,
 
 92 Wash.App. 630
 
 , 631, 637,
 
 962 P.2d 850
 
 (1998), review denied,
 
 137 Wash.2d 1032
 
 ,
 
 980 P.2d 1286
 
 (1999). Because these courts based their rulings on the reasonable expectation of privacy test recognized in
 
 Katz
 
 , their holdings logically would extend to all residences within their states. The Indiana Court of Appeals has similarly concluded that a canine sniff of a residence requires only a reasonable and articulable suspicion. See
 
 Hoop
 
 v.
 
 State
 
 ,
 
 909 N.E.2d 463
 
 , 468-71 (Ind. App. 2009), transfer denied,
 
 929 N.E.2d 782
 
 (Ind. 2010). Although "Indiana has explicitly rejected the expectation of privacy as a test of the reasonableness of a search or seizure"; (internal quotation marks omitted)
 
 id.,
 
 at 468 ; the court emphasized as central to its holding "the need to restrict arbitrary
 selection of persons to be searched ...." Id., at 470. If anything, such concerns are exacerbated by the presence of many dwellings in close proximity, as in an apartment complex. As a result, we suspect Indiana also would apply the reasonable suspicion requirement to residences within a multiunit building.
 

 Finally, several state appellate courts have determined that even a canine sniff of a nonresidential property may be a search under their respective state constitutions and may require a reasonable, articulable suspicion. In Alaska, a canine sniff of a commercial warehouse requires a reasonable and articulable suspicion;
 
 McGahan
 
 v.
 
 State
 
 ,
 
 807 P.2d 506
 
 , 510-11 (Alaska App. 1991) ; as does the canine sniff of an individual storage locker from a public hallway located in a storage facility in Pennsylvania.
 
 Commonwealth
 
 v.
 
 Johnston
 
 ,
 
 515 Pa. 454
 
 , 457-58, 465-66,
 
 530 A.2d 74
 
 (1987). A handful of states also extend this protection to private vehicles under their respective state constitutions. See
 
 State
 
 v.
 
 Tackitt
 
 ,
 
 315 Mont. 59
 
 , 69-70,
 
 67 P.3d 295
 
 (2003) ;
 
 State
 
 v.
 
 Pellicci
 
 ,
 
 133 N.H. 523
 
 , 533,
 
 580 A.2d 710
 
 (1990) ;
 
 Commonwealth
 
 v.
 
 Rogers
 
 ,
 
 578 Pa. 127
 
 , 134-37,
 
 849 A.2d 1185
 
 (2004). In light of the heightened privacy interests surrounding a person's home, it is safe to assume that, in these states, a canine sniff of a private residence would require at least a reasonable and articulable suspicion.
 

 In the other column, we are aware of only two state appellate courts that have concluded that a canine sniff of an apartment door in a multiunit building is not a search for fourth amendment purposes.
 
 [17]
 
 See
 
 Lindsey
 
 v.
 
 State
 
 ,
 
 226 Md.App. 253
 
 , 274,
 
 127 A.3d 627
 
 (2015) (because common area adjacent to apartment door is not curtilage and resident has no reasonable expectation of privacy in that common area, canine sniff conducted from common area is not search under fourth amendment),
 cert. dismissed,
 
 447 Md. 299
 
 ,
 
 135 A.3d 417
 
 (2016) ;
 
 State
 
 v.
 
 Nguyen
 
 , supra,
 
 841 N.W.2d at 681
 
 (canine sniff of common hallway adjacent to apartment door was not search because there is no reasonable expectation of privacy in contraband and common hallway is not curtilage). In
 
 Lindsey
 
 , the Maryland Court of Special Appeals concluded that the common area outside of an apartment door, which is where the canine search was conducted, did not constitute curtilage because the defendant, Shaun D. Lindsey, could not maintain "some form of exclusive control" over the area.
 
 [18]
 
 (Emphasis omitted.)
 
 Lindsey
 
 v.
 
 State
 
 , supra, at 280,
 
 127 A.3d 627
 
 . Because Lindsey lacked exclusive control over who entered and used the common area, the court also concluded that he did not have a reasonable expectation of privacy in that area. See
 
 id.
 
 We are not persuaded by
 
 Lindsey
 
 , however, because, even if we agreed with that court's conclusion that the common area is not curtilage, we disagree with
 the court's reasonable expectation of privacy analysis insofar as it is predicated on the officers' lawful presence in the common area rather than on the canine sniff of the apartment that was conducted from that common area.
 

 In
 
 Nguyen
 
 , the North Dakota Supreme Court held, first, that the technical trespass of police officers in the common hallways of an apartment building "[was] of no consequence because [the defendant, Matthew D.] Nguyen, had no reasonable expectation that the common hallways of the apartment building would be free from any intrusion."
 
 State
 
 v.
 
 Nguyen
 
 , supra,
 
 841 N.W.2d at 681
 
 . For essentially the same reason, the court further determined that the common hallway was not curtilage: "Having determined that, unlike the area immediately surrounding a home, a party does not have a legitimate expectation of privacy in the common hallways and shared spaces of an apartment building, [the court] conclude[s] [that] the common hallway is not an area within the curtilage of Nguyen's apartment."
 
 Id., at 682
 
 . Finally, with respect to Nguyen's expectation of privacy inside his apartment, the court, in reliance on
 
 Place
 
 and its progeny, held that any such expectation did not reasonably extend to the contraband to which the trained narcotics detection dog alerted. See
 
 id.,
 
 at681-82.
 
 [19]
 
 For the foregoing reasons,
 we believe that, because
 an individual's privacy interests are greatest in his or her home, the court in
 
 Nguyen
 
 incorrectly equated a nonconsensual governmental intrusion into the home with a similar intrusion into a motor vehicle or a piece of luggage at a public airport. In any event, it appears that the weight of sister state precedent supports the view that the canine sniff of the defendant's door in the present case was a search under our constitution.
 

 Finally, we perceive no principled reason of public policy, and the state has identified none, why, in the context of canine sniffs, the firm and bright line that we draw at the entrance of the house should apply to single-family dwellings but not to dwellings in a multiunit building. Indeed, as the Seventh Circuit observed in
 
 Whitaker
 
 , allowing police dogs to sniff the doors of apartments but not freestanding homes would be deeply "troubling because it would apportion [constitutional] protections on grounds that correlate with income, race, and ethnicity. For example, according to the [United States Census Bureau's] American Housing Survey for 2013, 67.8 [percent] of households composed solely of whites live in [one unit] detached houses. For households solely composed of blacks, that number dropped to 47.2 [percent]. And for Hispanic households, that number was 52.1 [percent]. The percentage of households that live in [single unit], detached houses consistently rises with income. At the low end, 40.9 [percent] of households that earned less than $10,000 lived in [single unit], detached houses, and, at the high end, 84 [percent] of households that earned more than $120,000 did so."
 
 [20]
 

 United States
 
 v.
 
 Whitaker
 
 , supra,
 
 820 F.3d at 854
 
 . For this important reason, we believe that public policy strongly favors the state constitutional interpretation advocated by the defendant in the present case.
 

 Accordingly, we are unable to agree with the state that all canine sniffs are constitutionally innocuous. Rather, for the reasons previously discussed in this opinion, we conclude that a canine sniff directed toward a home-whether freestanding or part of a multitenant structure-is a search under article first, § 7, and, as such, requires a warrant issued upon a court's finding of probable cause.
 
 [21]
 
 We
 therefore conclude that the defendant was entitled to the suppression of the evidence seized from his residence as the fruit of the unlawful canine sniff.
 

 IV
 

 RESPONSE TO THE CONCURRING JUSTICE
 

 In his concurring opinion, Justice Zarella contends that we should have decided this case under the federal constitution rather than under the state constitution. In support of this contention, he states that, as a general matter, "the proper mode of analysis [in a case involving claims under both the federal and state constitutions] should be to address the federal claim first, turning to the state constitutional claim only after determining that the federal constitution does not provide a basis for relief or if the applicable federal rule is truly unsettled."
 

 Because Justice Zarella concludes that the defendant in the present case prevails under settled fourth amendment principles, he asserts that we have no cause to consider the defendant's state constitutional claim. We agree with Justice Zarella that we turn first to the state constitutional claim when the issue is unsettled under the federal constitution or, if it is settled under the federal constitution, when the defendant is not entitled to relief thereunder. Cf.
 
 State
 
 v.
 
 Santiago
 
 ,
 
 318 Conn. 1
 
 , 13 n.11,
 
 122 A.3d 1
 
 (2015). Ordinarily, if the issue has been definitively resolved under the federal constitution, and settled law clearly supports the view advanced by the defendant, there is little reason to undertake the kind of searching and painstaking analysis that invariably will be necessary to resolve a state constitutional issue of first impression raised on appeal.
 
 [22]
 
 On the other hand, if the federal constitution does not clearly and definitively resolve the issue in the defendant's favor, we turn first to the state constitution to ascertain whether its provisions entitle the defendant to relief.
 
 [23]
 
 After all, as the ultimate arbiter of the state constitution, this court's interpretation of that constitution is final and conclusive, whereas we "can give only an informed guess of the meaning of the [f]ederal [c]onstitution."
 
 [24]
 

 D.
 

 Braithwaite, " An Analysis of the 'Divergence Factors': A Misguided Approach to Search and Seizure Jurisprudence Under the New Jersey Constitution,"
 
 33 Rutgers L.J. 1
 
 , 35 (2001-2002) ; see also, e.g.,
 
 State
 
 v.
 
 Joyce
 
 , supra,
 
 229 Conn. at
 
 15-16 n.6,
 
 639 A.2d 1007
 
 (when issue is not settled under federal constitution, we turn to state constitution rather than speculating as to how issue would be resolved under provisions of federal constitution).
 
 [25]
 

 We disagree, however, that federal case law definitively resolves the issue presented by this appeal. As we have indicated, only two federal appeals courts have determined that the use of a canine sniff at a home is a search for purposes of the fourth amendment, and the case on which Justice Zarella primarily relies,
 
 United States
 
 v.
 
 Thomas
 
 , supra, 757 F.2d at1367, has been criticized by a significant number of federal courts.
 
 [26]
 
 See,
 e.g.,
 
 United States
 
 v.
 
 Reed
 
 ,
 
 141 F.3d 644
 
 , 649-50 (6th Cir. 1998) (rejecting reasoning of
 
 Thomas
 
 and explaining that
 
 Thomas
 
 has not been followed by other courts);
 
 United States
 
 v.
 
 Lingenfelter
 
 ,
 
 997 F.2d 632
 
 , 638 (9th Cir. 1993) (declining to follow
 
 Thomas
 
 and observing that "
 
 Thomas
 
 has been rightfully criticized");
 
 United States
 
 v.
 
 Colyer
 
 ,
 
 878 F.2d 469
 
 , 475 (D.C. Cir. 1989) (questioning reasoning of
 
 Thomas
 
 as incompatible with United States Supreme Court cases involving canine sniffs);
 
 United States
 
 v.
 
 Cota-Lopez
 
 ,
 
 358 F.Supp.2d 579
 
 , 592 (W.D. Tex. 2002) (rejecting
 
 Thomas
 
 as contrary to United States Supreme Court precedent), aff'd,
 
 104 Fed.Appx. 931
 
 (5th Cir. 2004) ;
 
 United States
 
 v.
 
 Hogan
 
 ,
 
 122 F.Supp.2d 358
 
 , 369 (E.D.N.Y. 2000) ("
 
 Thomas
 
 ... has been criticized by several other circuit courts. Those courts have pointed out that the rationale underlying the
 
 Thomas
 
 decision conflicts with the underpinnings of the [United States] Supreme Court's holding that the canine sniff in
 
 Place
 
 did not constitute a search ....
 
 Thomas
 
 thus appears to be at odds with [Supreme Court precedent] .... Although
 
 Thomas
 
 remains the law in [the Second] [C]ircuit, the foregoing discussion suggests that it should not be applied expansively." [Citations omitted.] ).
 
 [27]
 

 As this criticism of
 
 Thomas
 
 reflects, the United States Supreme Court has never retreated from its reasoning in
 
 Place
 
 , namely, that a canine sniff of luggage at a public airport is not a search for fourth amendment purposes because that investigative technique reveals only contraband in which the subject of the investigation
 has no legitimate expectation of privacy. See, e.g.,
 
 United States
 
 v.
 
 Jacobsen
 
 ,
 
 466 U.S. 109
 
 , 124 n.24,
 
 104 S.Ct. 1652
 
 ,
 
 80 L.Ed.2d 85
 
 (1984) ("the reason [the
 
 Place
 
 canine sniff] did not intrude [on] any legitimate privacy interest was that the governmental conduct could reveal nothing about noncontraband items" [emphasis omitted] ). In fact, as we noted previously, in
 
 Illinois
 
 v.
 
 Caballes
 
 , supra,
 
 543 U.S. at 405
 
 ,
 
 125 S.Ct. 834
 
 , the court relied on the very same reasoning that it had employed in
 
 Place
 
 , concluding that a canine sniff of a motor vehicle, like a canine sniff of luggage at a public airport, "does not rise to the level of a constitutionally cognizable infringement";
 
 id., at 409
 
 ,
 
 125 S.Ct. 834
 
 ; because "governmental conduct that
 
 only
 
 reveals the possession of contraband compromises no legitimate privacy interest." (Emphasis in original; internal quotation marks omitted.)
 
 Id., at 408
 
 ,
 
 125 S.Ct. 834
 
 . Of course, the rationale that canine sniffs reveal only the existence of contraband is no less applicable to
 
 any
 
 canine sniff, including the sniff at issue in the present case. Until the United States Supreme Court decides whether the reasoning of
 
 Place
 
 and
 
 Caballes
 
 applies with equal force to a canine sniff of a home, it is impossible to say with confidence that the federal constitution bars the warrantless canine sniff that occurred in the present case. See, e.g.,
 
 State
 
 v.
 
 Guillen
 
 ,
 
 222 Ariz. 81
 
 , 85,
 
 213 P.3d 230
 
 (App. 2009) (characterizing this issue as presenting "a vexingly close question"), vacated on other grounds,
 
 223 Ariz. 314
 
 ,
 
 223 P.3d 658
 
 (2010) ; see also
 
 State
 
 v.
 
 Guillen
 
 ,
 
 223 Ariz. 314
 
 , 319,
 
 223 P.3d 658
 
 (2010) (observing that "the case law on dog sniffs of the exterior of a residence accessible to the public is far from clear" and that "cases from other jurisdictions are split on whether dog sniffs of the exterior of a residence violate the [f]ourth [a]mendment or their respective state constitutions").
 
 [28]
 
 Thus, contrary to Justice Zarella's contention, the fact that the Second
 Circuit Court of Appeals decided the federal constitutional issue in favor of the defendant some three decades ago in
 
 Thomas
 
 -many years before the seminal cases of
 
 Jardines
 
 ,
 
 Caballes
 
 and
 
 Kyllo
 
 were decided-by no means suggests that the law is truly settled under the fourth amendment.
 
 [29]
 
 This lack of clarity surrounding the propriety of the use of a warrantless canine sniff at the door of a residence under the federal constitution is further demonstrated by the positions taken by the current members of the United States Supreme Court on this precise issue in
 
 Jardines
 
 . As we discussed previously, the majority in
 
 Jardines
 
 , which was comprised of Justices Scalia (the authoring justice), and Justices Thomas, Ginsburg, Sotomayor, and Kagan, concluded that the canine sniff conducted at the base of Jardines' front door was a search under the fourth amendment because the sniff took place in the curtilage of the home. See
 
 Florida
 
 v.
 
 Jardines
 
 , supra,
 
 133 S.Ct. at 1417-18
 
 . In a concurrence joined by Justices Ginsburg and Sotomayor, but not Justices Scalia and Thomas, Justice Kagan expressed the view that the canine sniff also violated Jardines' reasonable expectation of privacy, and, for that reason as well, the sniff constituted a search protected by the fourth amendment. See
 
 id., at 1418
 
 (Kagan, J., concurring). Justice Alito, joined by Chief Justice Roberts and Justices Kennedy and Breyer, dissented.
 
 Id., at 1420
 
 (Alito, J., dissenting). In concluding that the canine sniff at Jardines' front door was not a search for fourth amendment purposes, Justice Alito rejected
 
 both
 
 the majority's curtilage rationale
 
 and
 
 Justice Kagan's reasonable expectation of privacy rationale.
 
 [30]
 

 Id., at 1424, 1426
 
 (Alito, J., dissenting).
 To summarize, four current members of the court-Chief Justice Roberts and Justices Kennedy, Breyer and Alito-have concluded that a canine sniff at the front door of a home is not a search that implicates
 the fourth amendment because, inter alia, the sniff does not violate the home owner's reasonable expectation of privacy. Three members of the court-Justices Ginsburg, Sotomayor and Kagan-take a contrary view. Justice Thomas, the remaining member of the court who also participated in
 
 Jardines
 
 , took no position on whether the canine sniff violated Jardines' reasonable expectation of privacy. Thus, four current members of the court would decide the present case
 
 against
 
 the defendant on federal constitutional grounds, three current members of the court would decide the present case
 
 in favor
 
 of the defendant on federal constitutional grounds, and one current member of the court has taken no express position on the issue. Even if we were to assume that Justice Thomas' decision not to join Justice Kagan's concurrence reveals nothing about his view on the matter, more current members of the court are on record as concluding that a canine sniff at the front door of a home is
 
 not
 
 a search and, consequently, does not violate the fourth amendment. Accordingly, we reject Justice Zarella's assertion that the defendant clearly prevails under the federal constitution because, in fact, we simply have no idea how a majority of the members of the United States Supreme Court would decide the issue. Although we believe that the more persuasive lower court precedent weighs in favor of our conclusion in this case, it can hardly be said that the issue is a settled one.
 

 The judgment is affirmed.
 

 In this opinion ROGERS, C.J., and McDONALD, ROBINSON and VERTEFEUILLE, Js., concurred.
 

 ZARELLA, J., concurring in the judgment.
 

 I agree that the use of a dog sniff to detect contraband inside the condominium unit occupied by the defendant, Dennis Kono, violated his rights, but for reasons different from those given by the majority. The majority relies on our state constitution, but, in my view, looking to the state constitution is unnecessary when, as in the present case, existing federal constitutional doctrine favors the defendant. Instead, when a party raises a claim under both the federal and state constitutions, the proper mode of analysis should be to address the federal claim first, turning to the state constitutional claim only after determining that the federal constitution does not provide a basis for relief or if the applicable federal rule is truly unsettled. I therefore respectfully concur only in the judgment.
 

 I
 

 Turning to the federal constitutional question, I would first conclude that federal case law from the United States Court of Appeals for the Second Circuit resolves the federal constitutional claim before us. Three decades ago, in
 
 United States
 
 v.
 
 Thomas
 
 ,
 
 757 F.2d 1359
 
 , 1367 (2d Cir.), cert. denied sub nom.
 
 Fisher
 
 v.
 
 United States
 
 ,
 
 474 U.S. 819
 
 ,
 
 106 S.Ct. 66
 
 ,
 
 88 L.Ed.2d 54
 
 (1985), and cert. denied sub nom.
 
 Wheelings
 
 v.
 
 United States
 
 ,
 
 474 U.S. 819
 
 ,
 
 106 S.Ct. 67
 
 ,
 
 88 L.Ed.2d 54
 
 (1985), and cert. denied sub nom.
 
 Rice
 
 v.
 
 United States
 
 ,
 
 479 U.S. 818
 
 ,
 
 107 S.Ct. 78
 
 ,
 
 93 L.Ed.2d 34
 
 (1986), the Second Circuit concluded that a warrantless dog sniff of the contents of a home violates the resident's reasonable expectation of privacy, even if the resident lives in an apartment and the dog is outside of his apartment door in a shared hallway. The holding in
 
 Thomas
 
 remains good law; see, e.g.,
 
 United States
 
 v.
 
 Hayes
 
 ,
 
 551 F.3d 138
 
 , 144 (2d Cir. 2008) ; and the facts
 of
 
 Thomas
 
 match the facts of the present case in every relevant respect.
 As the majority explains, even though decisions of the Second Circuit do not bind this court, we accord them great weight on questions of federal law, including federal constitutional law, when the United States Supreme Court has not expressly resolved the issue before us. See, e.g.,
 
 Dayner
 
 v.
 
 Archdiocese of Hartford
 
 ,
 
 301 Conn. 759
 
 , 783,
 
 23 A.3d 1192
 
 (2011) ("it is well settled that decisions of the Second Circuit, while not binding [on] this court, nevertheless carry particularly persuasive weight in the resolution of issues of federal law when the United States Supreme Court has not spoken on the point" [internal quotation marks omitted] ). Deferring to the Second Circuit's decisions on matters of federal law promotes principles of comity and consistency in the application of federal law in this state. See id., at 784,
 
 23 A.3d 1192
 
 (noting that it would be " 'bizarre' " for application of federal law to depend on whether case was brought in state or federal court); see also
 
 Szewczyk
 
 v.
 
 Dept. of Social Services
 
 ,
 
 275 Conn. 464
 
 , 475-76 n.11,
 
 881 A.2d 259
 
 (2005) (citing cases explaining reasons for our deference to Second Circuit).
 

 I see no compelling reason to depart from the approach of the Second Circuit in the present case. Nothing has eroded the basis for its holding in
 
 Thomas
 
 since that case was decided. Although
 
 Thomas
 
 was decided more than thirty years ago and was originally met with criticism, the Second Circuit has more recently cited it with approval;
 
 United States
 
 v.
 
 Hayes
 
 , supra,
 
 551 F.3d at
 
 143-44 ; and more recent United States Supreme Court decisions issued after
 
 Thomas
 
 have, in fact, bolstered its reasoning.
 
 [1]
 
 See, e.g.,
 
 Kyllo
 
 v.
 
 United
 

 States
 
 ,
 
 533 U.S. 27
 
 , 34-35, 40,
 
 121 S.Ct. 2038
 
 ,
 
 150 L.Ed.2d 94
 
 (2001) ; see also
 
 Florida
 
 v.
 
 Jardines
 
 , --- U.S. ----,
 
 133 S.Ct. 1409
 
 , 1417-18,
 
 185 L.Ed.2d 495
 
 (2013) ;
 
 Florida
 
 v.
 
 Jardines
 
 , supra, at 1418 (Kagan, J., concurring). And, as the majority explains, the only circuit court to have addressed the question after
 
 Kyllo
 
 and
 
 Jardines
 
 were decided reached the same conclusion as the Second Circuit in
 
 Thomas
 
 . See
 
 United States
 
 v.
 
 Whitaker
 
 ,
 
 820 F.3d 849
 
 , 852-54 (7th Cir. 2016). To be sure, Justice Espinosa has raised significant distinctions between the issues decided by the United States Supreme Court in
 
 Kyllo
 
 and
 
 Jardines
 
 , and the precise issue raised in the present case.
 
 [2]
 
 But, in my view, these distinctions do not justify a departure from Second Circuit precedent, at least if we are applying federal law.
 
 [3]
 
 I thus would begin with the federal constitutional analysis, apply the Second Circuit's decision in
 
 Thomas
 
 ,
 and conclude that the dog sniff of the defendant's condominium unit in the present case was a search under the fourth amendment. Deciding otherwise would have the bizarre consequence of granting our citizens
 
 less
 
 protection under federal law in state courts than that provided under federal law in federal courts.
 

 II
 

 Because we may resolve the present case in the defendant's favor under the federal constitution, I disagree with the majority's decision to sidestep the federal constitution and instead resolve this issue by creating new doctrine under the state constitution. Specifically, I disagree with the majority's assertion, which is made without citation to authority, that we should analyze a federal constitutional claim first only if we are "able to say with a high degree of confidence that the United States Supreme Court, if presented with the federal constitutional claim," would reach the same conclusion. Footnote 23 of the majority opinion. The ability to confidently forecast how the United States Supreme Court might decide a question has not, in prior decisions, been treated as a prerequisite to beginning with a federal constitutional analysis. See generally, e.g.,
 
 Pham
 
 v.
 
 Starkowski
 
 ,
 
 300 Conn. 412
 
 , 428-62,
 
 16 A.3d 635
 
 (2011) ;
 
 State
 
 v.
 
 Jenkins
 
 ,
 
 298 Conn. 209
 
 , 231-48,
 
 3 A.3d 806
 
 (2010). Indeed, we routinely decide federal constitutional questions without clear guidance from the United States Supreme Court when those federal claims are made without accompanying state constitutional claims. Consequently, in light of the Second Circuit's prior decision in
 
 Thomas
 
 , I do not view the relevant federal precedent to be so ambiguous as to require that we avoid a federal analysis in the first instance.
 

 To be sure, if the federal rule were truly unsettled-perhaps if
 
 neither
 
 the United States Supreme Court
 
 nor
 
 the Second Circuit had addressed the question, and
 other federal courts were generally silent on the matter-I might agree with the majority's approach. In the present case, however, the Second Circuit has already spoken on the question before us, on at least two occasions, so its decision is already binding on federal law enforcement personnel and the federal district courts
 
 in this state
 
 .
 

 In addition, resolving the case under the federal constitution is more consistent with the procedural history of this case. Throughout the proceedings, the parties have principally argued the case under the federal constitution. In the trial court, the defendant moved to suppress the evidence at issue first under the federal constitution and only added a claim under the state constitution as an alternative. The trial court decided the motion to suppress in the defendant's favor under the federal constitution and therefore found it unnecessary to address the claim under the state constitution, leaving us without any lower court ruling on the state constitution to consider. And, because the trial court based its decision on the federal constitution
 alone, the parties in their appeal to this court again focused their arguments on the federal constitution, presenting the state constitutional claim as an alternative ground for affirmance. Reaching the state constitutional issue in the present appeal is unnecessary.
 

 Perhaps the majority is concerned that the United States Supreme Court might disagree with its conclusion, and thus wants to insulate our decision from further review and possible reversal. This reasoning has its proponents; see, e.g., W. Horton, The Connecticut State Constitution (2d Ed. 2012) p. 36; but it seems to me to be an insufficient reason to avoid applying the federal constitution when it is otherwise dispositive. If the United States Supreme Court ever does overrule
 
 Thomas
 
 , in either this case or another case, we could revisit the question under our state constitution
 
 then
 
 ,
 when there is actually a principled need for doing so, and with the added benefit of being able to consider the United States Supreme Court's rationale as we consider the parameters of our own constitution. Indeed, if the United States Supreme Court were to disagree with
 
 Thomas
 
 , the validity of the majority's state constitutional analysis will necessarily be called into question in any event, given that we consider federal law when interpreting our state constitution and our understanding of federal law would have been incorrect.
 
 [4]
 

 State
 
 v.
 
 Geisler
 
 ,
 
 222 Conn. 672
 
 , 685,
 
 610 A.2d 1225
 
 (1992) (federal precedent is used as persuasive tool when court construes state constitution); see also
 
 State
 
 v.
 
 Skok
 
 ,
 
 318 Conn. 699
 
 , 730-31,
 
 122 A.3d 608
 
 (2015) (
 
 Zarella
 
 ,
 
 J.
 
 , concurring) (agreeing that federal precedent provides persuasive authority when court interprets provisions of state constitution, at least when such provisions are related to federal constitutional provisions).
 

 III
 

 The majority's decision to look first to the state constitution-a view grounded, in my view, on a faulty premise-highlights an inconsistency in our case law about whether we should first look to the federal or the state constitution when claims under both are properly raised.
 
 [5]
 

 Our prior cases, including many search and seizure cases, do not reflect a principled approach to this question. For example, this court has, on a few occasions, relied solely on the state constitution without any explanation of why it did not conduct any analysis under the federal constitution. See, e.g.,
 
 State
 
 v.
 
 Joyce
 
 ,
 
 229 Conn. 10
 
 , 15,
 
 639 A.2d 1007
 
 (1994) (declining to reach federal constitutional claim because state constitution provided basis for relief). In one decision, we noted that we should
 
 always
 
 examine the state constitution first.
 
 State
 
 v.
 
 Chapman
 
 ,
 
 227 Conn. 616
 
 , 626 n.8,
 
 632 A.2d 674
 
 (1993), superseded,
 
 229 Conn. 529
 
 ,
 
 643 A.2d 1213
 
 (1994). But this court has hardly followed that advice in practice, and has often addressed federal claims first, turning to the state constitution only after concluding that the federal constitution did not provide a basis for relief. See, e.g.,
 
 State
 
 v.
 
 Jenkins
 
 , supra,
 
 298 Conn. at 231-32, 259-61
 
 ,
 
 3 A.3d 806
 
 (addressing claim regarding allegedly illegal search under federal constitution before turning to state constitutional analysis);
 
 Contractor's Supply of Waterbury, LLC
 
 v.
 
 Commissioner of Environmental Protection
 
 ,
 
 283 Conn. 86
 
 , 92, 97-98,
 
 925 A.2d 1071
 
 (2007) (analyzing federal equal protection claim before turning to state constitutional claim);
 
 State
 
 v.
 
 Ledbetter
 
 ,
 
 275 Conn. 534
 
 , 559-60,
 
 881 A.2d 290
 
 (2005) (resolving federal constitutional claim concerning eyewitness identification before turning to claim under state constitution), cert. denied,
 
 547 U.S. 1082
 
 ,
 
 126 S.Ct. 1798
 
 ,
 
 164 L.Ed.2d 537
 
 (2006) ;
 
 State
 
 v.
 
 Linares
 
 ,
 
 232 Conn. 345
 
 , 354, 376,
 
 655 A.2d 737
 
 (1995) (addressing first amendment claim before addressing claims under analogous state constitutional provisions).
 

 This waffling between deciding claims variously under the state or federal constitution, especially in the area of search and seizure law, is not a practice that
 we should perpetuate-at the very least because it gives our constitutional jurisprudence the appearance of being unprincipled. I would take this opportunity to clarify our mode of analysis with respect to the order of our consideration of federal and state constitutional issues. In my view, when a party properly raises a claim under both a federal constitutional provision and a comparable state constitutional provision, the better practice is to first address the question under the federal constitution, turning to the state constitution only after concluding that the federal provision does not provide a basis for relief or if the interpretation of the federal provision is truly unsettled or ambiguous. Ultimately, the quality of our constitutional analysis is most critical in a given case, but there are several prudential reasons to prefer consideration of the federal constitution first.
 

 A
 

 For one thing, looking to the federal constitution first is more consistent with the reality of existing legal doctrine concerning individual rights and with our understanding of the role of our state constitution, which recognizes that the federal constitution sets a national minimum for the protection of individual rights but leaves states to interpret their constitutions to provide greater protection.
 

 Some commentators and courts recommend looking to the state constitution first when confronted with a claim under both the federal and state constitution-an approach commonly referred to as the primacy model. Under this approach, the state court looks first to its own state constitution, looking to the federal constitution only if the state constitution fails to provide a basis for relief. See, e.g., W. Horton, supra, p. 37; J. Landau, " Some Thoughts About 'State Constitutional Interpretation,"
 
 115 Penn. St. L. Rev. 837
 
 , 845-46 (2011) ; cf.
 

 H. Linde, "First Things First: Rediscovering the States' Bill of Rights,"
 
 9 U. Balt. L. Rev. 379
 
 , 387 (1980). Proponents argue that, in a federal system, the first referent of a state judge should be the state's own laws and constitution, not the laws of another government. See W. Horton, supra, p. 37.
 

 But this approach is inconsistent with the plain reality that federal constitutional law now dominates the field of individual
 constitutional rights, even in state proceedings, at least since the United States Supreme Court had determined that most of the guarantees in the federal Bill of Rights apply to the states by virtue of the due process clause of the fourteenth amendment-a process often referred to as incorporation. See U.S. Const., amend. XIV, § 1 (prohibiting state governments from depriving "any person of life, liberty or property, without due process of law").
 

 Before incorporation, state courts had no need to look beyond their state constitution or to consider which constitution to apply in a given case, because the federal constitution did not apply to state proceedings. State and federal courts treated the federal constitution as applying only to the federal government, with limited exceptions for when the federal constitution explicitly restricted actions by a state government, such as the prohibition on passing an ex post facto law. U.S. Const., Art. I, § 10, cl. 1. Thus, in
 
 Barron
 
 v.
 
 Mayor & City Council
 
 , 32 U.S. (7 Pet.) 243, 250,
 
 8 L.Ed. 672
 
 (1833), the court rejected a claim that the fifth amendment's takings clause applied to state legislation. Writing for the court, Chief Justice John Marshall explained: "The [federal] constitution was ordained and established by the people of the United States for themselves, for their own government, and not for the government of the individual states. Each state established a constitution for itself, and, in that constitution, provided such limitations and restrictions on the powers of its particular government as its judgment dictated." Id., at 247. Because
 the amendments in the Bill of Rights "contain no expression indicating an intention to apply them to the state governments," the court concluded that it could not "so apply them." Id., at 250.
 

 Under this view, courts accepted that rights granted by states might vary from those granted under the federal constitution. As the court explained in
 
 United States
 
 v.
 
 Cruikshank
 
 ,
 
 92 U.S. 542
 
 ,
 
 23 L.Ed. 588
 
 (1875), "[w]e have in our political system a government of the United States and a government of each of the several [s]tates. Each one of these governments is distinct from the others, and each has citizens of its own who owe it allegiance, and whose rights, within its jurisdiction, it must protect. The same person may be at the same time a citizen of the United States and a citizen of a [s]tate, but his rights of citizenship under one of these governments will be different from those he has under the other."
 
 Id., at 549
 
 .
 

 Because the federal and state constitutions stood truly independent of one another, state courts looked to their own constitutions to determine the rights of individuals, and many states, including Connecticut, interpreted their state constitutions to provide less protection than the federal constitution. See, e.g.,
 
 State
 
 v.
 
 Michael J
 
 .,
 
 274 Conn. 321
 
 , 351,
 
 875 A.2d 510
 
 (2005) (noting that Connecticut constitution provided less protection against double jeopardy until United States Supreme Court applied fifth amendment guarantee against double jeopardy to states);
 
 State
 
 v.
 
 Magnano
 
 ,
 
 97 Conn. 543
 
 , 546,
 
 117 A. 550
 
 (1922) (declining to apply federal exclusionary rule in state proceeding because state constitution did not require exclusion of illegally obtained evidence, and federal constitution was not binding).
 

 But this dichotomy between state and federal rights began to erode as the United States Supreme Court
 recognized that certain protections in the federal Bill of Rights might be considered an integral part of the due process guaranteed to state citizens by the due process clause of the fourteenth amendment. The court did not incorporate the entire Bill of Rights at once but gradually incorporated many of
 its provisions on a case-by-case basis over a period of several decades. The process began with
 
 Chicago, Burlington & Quincy Railroad Co
 
 . v.
 
 Chicago
 
 ,
 
 166 U.S. 226
 
 ,
 
 17 S.Ct. 581
 
 ,
 
 41 L.Ed. 979
 
 (1897), in which the court concluded that "a judgment of a state court, even if it [is] authorized by statute, [pursuant to which] private property is taken for the [s]tate or under its direction for public use, without compensation made or secured to the owner, is, upon principle and authority, wanting in the due process of law required by the [f]ourteenth [a]mendment of the [c]onstitution of the United States ...."
 
 Id., at 241
 
 ,
 
 17 S.Ct. 581
 
 . And, in
 
 Gitlow
 
 v.
 
 New York
 
 ,
 
 268 U.S. 652
 
 ,
 
 45 S.Ct. 625
 
 ,
 
 69 L.Ed. 1138
 
 (1925), the court concluded that certain first amendment protections also applied to state governments, explaining that, "freedom of speech and of the press-which are protected by the [f]irst [a]mendment from abridgment by Congress-are among the fundamental personal rights and liberties protected by the due process clause of the [f]ourteenth [a]mendment from impairment by the [s]tates." (Internal quotation marks omitted.)
 
 Id., at 666
 
 ,
 
 45 S.Ct. 625
 
 .
 

 The incorporation of constitutional rights through the due process clause of the fourteenth amendment progressed slowly thereafter, until the Warren Court
 
 [6]
 
 in the 1960s increased the pace substantially, particularly for amendments affecting the rights of the accused in a state criminal proceeding. See, e.g.,
 
 Benton
 
 v.
 
 Maryland
 
 ,
 
 395 U.S. 784
 
 , 787,
 
 89 S.Ct. 2056
 
 ,
 
 23 L.Ed.2d 707
 
 (1969) (applying fifth amendment guarantee against
 double jeopardy to states);
 
 Duncan
 
 v.
 
 Louisiana
 
 ,
 
 391 U.S. 145
 
 , 149,
 
 88 S.Ct. 1444
 
 ,
 
 20 L.Ed.2d 491
 
 (1968) (states must apply sixth amendment right to jury trial to state criminal trials);
 
 Washington
 
 v.
 
 Texas
 
 ,
 
 388 U.S. 14
 
 , 18-19,
 
 87 S.Ct. 1920
 
 ,
 
 18 L.Ed.2d 1019
 
 (1967) (sixth amendment guarantee of compulsory process to obtain favorable witnesses applies to states);
 
 Klopfer
 
 v.
 
 North Carolina
 
 ,
 
 386 U.S. 213
 
 , 222-23, 226,
 
 87 S.Ct. 988
 
 ,
 
 18 L.Ed.2d 1
 
 (1967) (sixth amendment right to speedy trial applies to states);
 
 Griffin
 
 v.
 
 California
 
 ,
 
 380 U.S. 609
 
 , 615,
 
 85 S.Ct. 1229
 
 ,
 
 14 L.Ed.2d 106
 
 (1965) (fifth amendment right against self-incrimination applies to states);
 
 Pointer
 
 v.
 
 Texas
 
 ,
 
 380 U.S. 400
 
 , 403,
 
 85 S.Ct. 1065
 
 ,
 
 13 L.Ed.2d 923
 
 (1965) (sixth amendment right of accused to confront witnesses applies to states);
 
 Aguilar
 
 v.
 
 Texas
 
 ,
 
 378 U.S. 108
 
 , 110,
 
 84 S.Ct. 1509
 
 ,
 
 12 L.Ed.2d 723
 
 (1964) (applying certain fourth amendment standards for obtaining warrant to states), overruled in part on other grounds by
 
 Illinois
 
 v.
 
 Gates
 
 ,
 
 462 U.S. 213
 
 ,
 
 103 S.Ct. 2317
 
 ,
 
 76 L.Ed.2d 527
 
 (1983) ;
 
 Gideon
 
 v.
 
 Wainwright
 
 ,
 
 372 U.S. 335
 
 , 342,
 
 83 S.Ct. 792
 
 ,
 
 9 L.Ed.2d 799
 
 (1963) (sixth amendment right to appointed counsel for indigent defendants applies to states);
 
 Robinson
 
 v.
 
 California
 
 ,
 
 370 U.S. 660
 
 , 666-67,
 
 82 S.Ct. 1417
 
 ,
 
 8 L.Ed.2d 758
 
 (1962) (states bound by eighth amendment protection from cruel and unusual punishments);
 
 Mapp
 
 v.
 
 Ohio
 
 ,
 
 367 U.S. 643
 
 , 655,
 
 81 S.Ct. 1684
 
 ,
 
 6 L.Ed.2d 1081
 
 (1961) (applying fourth amendment exclusionary rule to state prosecutions).
 

 The rapid progress of incorporation in the 1960s arose principally from the court's concerns over the fairness of criminal proceedings when states did not guarantee their citizens the same protections in state proceedings that their citizens already enjoyed in federal court. For example, before the decision in
 
 Mapp
 
 , the federal exclusionary rule did not apply in state prosecutions. See
 
 Mapp
 
 v.
 
 Ohio
 
 , supra,
 
 367 U.S. at 657-58
 
 ,
 
 81 S.Ct. 1684
 
 . As a result,
 although the federal constitution barred federal prosecutors from using illegally obtained evidence, state prosecutors were free to use that same evidence in state prosecutions. See
 
 id., at 658
 
 ,
 
 81 S.Ct. 1684
 
 . This dichotomy encouraged federal law enforcement officers to turn evidence obtained illegally under federal law over to state authorities for their use in a state prosecution, a practice commonly known as the " 'silver platter' " doctrine.
 
 Id., at 653
 
 ,
 
 81 S.Ct. 1684
 
 ; see
 
 id., at 658
 
 ,
 
 81 S.Ct. 1684
 
 . This practice substantially undermined the value of the fourth amendment's guarantee against unreasonable searches and seizures. See
 
 id., at 658
 
 ,
 
 81 S.Ct. 1684
 
 .
 

 Concern for the undermining of federal constitutional protections led in significant part to the court's decision in
 
 Mapp
 
 to apply the fourth amendment exclusionary rule against the states, a decision that began the rapid acceleration of incorporation. In justifying its decision on practical grounds, the court observed that "a federal prosecutor [could] make no use of evidence illegally seized, but a [s]tate's attorney across the street could";
 
 id., at 657
 
 ,
 
 81 S.Ct. 1684
 
 ; such that "federal officers, being human, were ... invited to and did ... step across the street to the [s]tate's attorney with their unconstitutionally seized evidence."
 
 Id., at 658
 
 ,
 
 81 S.Ct. 1684
 
 . The court was concerned that, through this practice, "the [s]tate, by admitting evidence unlawfully seized, serve[d] to encourage disobedience to the [f]ederal [c]onstitution, which it is bound to uphold."
 
 Id., at 657
 
 ,
 
 81 S.Ct. 1684
 
 ; see also W. Brennan, " The Bill of Rights and the States: The Revival of State Constitutions As Guardians of Individual Rights,"
 
 61 N.Y.U. L. Rev. 535
 
 , 541 (1986) ("[a] healthy federalism is not promoted by allowing state officers to seize evidence illegally or by permitting state courts to utilize such evidence" [emphasis omitted] ).
 

 The solution to this problem, the court explained, was uniformity between the limitations on federal and state authorities in criminal proceedings. According to the court, "[f]ederal-state cooperation in the solution
 of crime under constitutional standards will be promoted, if only by recognition of their now mutual obligation to respect the same fundamental criteria in their approaches. ... Denying shortcuts to only one of two cooperating law enforcement agencies tends naturally to breed legitimate suspicion of working arrangements whose results are equally tainted." (Citation omitted; internal quotation marks omitted.)
 
 Mapp
 
 v.
 
 Ohio
 
 , supra,
 
 367 U.S. at 658
 
 ,
 
 81 S.Ct. 1684
 
 .
 

 The incorporation surge of the 1960s forced state courts, for the first time, to consider the federal constitution in addition to any coordinate state constitutional provisions. Because many state constitutions had provided less protection than the federal constitution, litigants began to favor claims under the federal constitution, and the federal constitution took on a dominant role in the field of individual rights nationwide, especially the rights of criminal defendants. See, e.g., R. Range, note, "Reverse Silver Platter: Should Evidence That State Officials Obtained in Violation of a State Constitution Be Admissible in a Federal Criminal Trial?,"
 
 45 Wash. & Lee L. Rev. 1499
 
 , 1512 (1988) ("[b]ecause federal protection of individual rights greatly was expanding, state courts had little or no incentive independently to interpret state constitutions as providing greater protection than the federal constitution"). Instead of relying on a patchwork of state constitutions, state courts across the country were bound to apply much of the federal Bill of Rights in their proceedings, giving rise to a new, nationwide body of law. See W. Brennan, supra,
 
 61 N.Y.U. L. Rev. 540
 
 ("[i]n the years between 1961 and
 1969, the [United States] Supreme Court interpreted the [f]ourteenth [a]mendment to nationalize civil rights, making the great guarantees of life, liberty, and property binding on all governments throughout the nation"). Prior decisions in Connecticut providing less protection under
 our state constitution were overruled. See, e.g.,
 
 State
 
 v.
 
 DelVecchio
 
 ,
 
 149 Conn. 567
 
 , 572-73,
 
 182 A.2d 402
 
 (1962) (applying federal exclusionary rule after United States Supreme Court applied fourth amendment protections to states); see also
 
 State
 
 v.
 
 Michael J.
 
 , supra,
 
 274 Conn. at 351-52
 
 ,
 
 875 A.2d 510
 
 (noting that Connecticut constitution provided less protection against double jeopardy until United States Supreme Court applied fifth amendment protections to states). Litigants and courts have since continued to overwhelmingly favor claims under the federal constitution, raising a state constitutional claim, if at all, as an alternative in case the federal claim fails. See, e.g., R. Williams, " State Constitutional Methodology in Search and Seizure Cases,"
 
 77 Miss. L.J. 225
 
 , 241 (2007) ; see also " Developments in the Law: The Interpretation of State Constitutional Rights,"
 
 95 Harv. L. Rev. 1324
 
 , 1357 (1982). Law schools principally teach federal constitutional rights, and commentators, judges, and lawyers today are far more familiar with the federal constitutional protections than those of the state constitutions, which vary from state to state. The preference for the federal constitution demonstrated by the parties and the trial court in the present case illustrates the point.
 

 To be sure, the rise of the federal constitution in state proceedings has not entirely sidelined state constitutions. During the 1970s, the United States Supreme Court adopted limitations and exceptions for many of the rights the court previously had expanded on and granted to state citizens in the 1960s. This curtailment led commentators and dissenting United States Supreme Court justices in the 1970s and 1980s to encourage state courts to reject that court's recent curtailments by finding greater protection for individual rights under state constitutions. See, e.g., R. Range, supra,
 
 45 Wash. & Lee L. Rev. 1512
 
 -13; see also W. Brennan, supra,
 
 61 N.Y.U. L. Rev. 548
 
 -50.
 

 Although this call for action led to a reemergence of the state constitution as an independent source of rights; see R. Range, supra,
 
 45 Wash. & Lee L. Rev. 1511
 
 -13; as a practical matter, the opportunity for the state constitution to have a truly dispositive impact has substantially narrowed. "Developments in the Law: The Interpretation of State Constitutional Rights," supra,
 
 95 Harv. L. Rev. 1356
 
 ("the preeminence and supremacy of federal constitutional interpretation narrow the field for state elaboration and shape the context in which state constitutional law must evolve"). The state constitution can now make a difference in the outcome of a case only if it provides
 
 greater
 
 protection than the federal constitution.
 
 [7]
 
 Indeed, our own cases recognize this more limited role of our state constitution. This court repeatedly has emphasized that the federal constitution sets "a minimum national standard for the exercise of individual rights" that states must guarantee but permits states to provide "higher levels of protection for such rights" under state law. (Internal quotation marks omitted.)
 
 State
 
 v.
 
 Geisler
 
 , supra,
 
 222 Conn. at 684
 
 ,
 
 610 A.2d 1225
 
 ; see also
 
 Kerrigan
 
 v.
 
 Commissioner of Public Health
 
 ,
 
 289 Conn. 135
 
 , 155-56,
 
 957 A.2d 407
 
 (2008) ;
 
 State
 
 v.
 
 Ledbetter
 
 , supra, 275 Conn. at 560,
 
 881 A.2d 290
 
 ;
 
 State
 
 v.
 
 Linares
 
 , supra,
 
 232 Conn. at 378-79
 
 ,
 
 655 A.2d 737
 
 ;
 
 Fair Cadillac-Oldsmobile Isuzu Partnership
 
 v.
 
 Bailey
 
 ,
 
 229 Conn. 312
 
 , 316-17,
 
 640 A.2d 101
 
 (1994).
 

 The primacy approach of putting the state constitution first stands in contrast to the primary position the federal constitution occupies in the field of individual rights, even in state proceedings, and thus assigns to the state constitution a role it no longer holds. See "Developments in the Law: The Interpretation of State Constitutional Rights," supra,
 
 95 Harv. L. Rev. 1357
 
 "The failing of the primacy model is that this assumption no longer resembles reality. Nor does it reflect the fact that litigants typically present state constitutional issues only when they expect an unfavorable federal constitutional result. Federal assumption of the dominant role in the federal system-and particularly in the protection of individual rights-has rendered the primacy model obsolete." [Footnote omitted.] ). Instead, "[f]or state constitutional law to assume a realistic role, state courts must acknowledge the dominance of federal law and focus directly on the [gap filling] potential of state constitutions."
 
 Id.
 

 B
 

 Given the respective roles of the federal and state constitutions following incorporation, I believe the better approach is one that resolves claims under the federal constitution first, and that looks to the state constitution when the federal constitution fails to provide the protections sought. This method-commonly called an interstitial approach-recognizes that the federal constitution sets minimum protections and calls for application of the state constitution only when necessary to supplement the protections of the federal constitution if the state might provide greater protection. See, e.g., M. Kelman, "Foreword: Rediscovering the State Constitutional Bill of Rights,"
 
 27 Wayne L. Rev. 413
 
 , 429-31 (1981); J. Landau, supra,
 
 115 Penn. St. L. Rev. 846
 
 ; "Developments in the Law: The Interpretation of State Constitutional Rights," supra,
 
 95 Harv. L. Rev. 1356
 
 -57.
 

 Federal law marks a natural starting point for any claim made under both the federal and state constitutions. In most cases, the federal rule will be readily ascertainable. Because litigants have strongly favored federal claims, courts across the country apply the federal constitution and do so more often than we apply our
 own state constitution. This has created an "expansive body of federal law" far more developed than state constitutional law on an overlapping topic. "Developments in the Law: The Interpretation of State Constitutional Rights," supra,
 
 95 Harv. L. Rev. 1357
 
 (state constitutions are better served when performing gap filling role in light of extensive number of federal decisions already covering much of field).
 

 Starting with the federal constitution better allows us to articulate differences between the federal and state constitutions when they exist. When the state constitution provides protection not afforded by the federal constitution, certainly, we have a duty to enforce the state constitution. See, e.g.,
 
 State
 
 v.
 
 Dukes
 
 ,
 
 209 Conn. 98
 
 , 112,
 
 547 A.2d 10
 
 (1988). But deciding a claim under the state constitution without first articulating the result under the federal constitution can leave ambiguity about whether and to what extent our constitution actually differs from the federal constitution. One commentator has explained that, "[w]hen state judges pass over a fairly arguable federal issue ... we do not know whether the decision upholding the claim of state constitutional rights is a genuinely differentiated act of state
 interpretation or a crypto-federal ruling." M. Kelman, supra,
 
 27 Wayne L. Rev. 430
 
 . Instead, the better practice is to declare the scope of the federal constitution before embarking on a state constitutional analysis. Doing so clearly delineates the differences between the two constitutions. Indeed, "[b]y proceeding from a failed federal claim to the question [of] whether the state constitution grants broader rights in the circumstances of the case, the state court eliminates an ambiguity that otherwise might shroud its decision. It tells us distinctly, and obliges the court to think more carefully about, whether and why the state constitution differs from or retains the same meaning as the federally interpreted counterpart." Id., 429. It also helps to avoid the appearance that the
 state constitutional analysis is merely a result oriented rejection of the federal rule rather than truly an independent and principled interpretation of our state charter. See id., 430-31 ("[t]he more credible separation of the state from the federal interpretation is that which takes place in the first place by a clear cut disposition of the [federal] issue followed by the state constitutional pronouncement").
 

 Moreover, analyzing a claim first under the federal constitution coincides with our mode of state constitutional interpretation, which requires us to consider federal law on the topic in any event. Federal constitutional jurisprudence, although not binding, provides persuasive authority for any interpretation or application of an analogous provision of our state constitution. See, e.g.,
 
 State
 
 v.
 
 Linares
 
 , supra,
 
 232 Conn. at 378-79
 
 ,
 
 655 A.2d 737
 
 . Indeed, we use federal precedent as one of six interpretive tools when construing our constitution, at least when our state constitution has a federal analog. See, e.g.,
 
 State
 
 v.
 
 Geisler
 
 , supra,
 
 222 Conn. at 685
 
 ,
 
 610 A.2d 1225
 
 ; see also
 
 State
 
 v.
 
 Skok
 
 , supra, 318 Conn. at 729-31,
 
 122 A.3d 608
 
 (
 
 Zarella
 
 ,
 
 J.
 
 , concurring). If, after reviewing federal case law in the context of a state constitutional analysis, it becomes apparent that the federal constitution would provide relief, there is no practical need for continuing with a needless state constitutional disquisition.
 

 Beginning with the federal constitution also helps to avoid unnecessary constitutional decision making. If the federal constitution provides relief in a given case, we have no need to consider the question separately under the state constitution. As a matter of judicial restraint, we commonly avoid addressing constitutional questions that are not necessary to our disposition. See, e.g.,
 
 State
 
 v.
 
 Cofield
 
 ,
 
 220 Conn. 38
 
 , 49-50,
 
 595 A.2d 1349
 
 (1991) (declining to consider whether recent United States Supreme Court decision also applied under state constitution when existing federal constitutional law
 was dispositive). If the federal constitution affords relief, we should not conduct an unnecessary state constitutional analysis, especially when, as in the present case, doing so requires us to needlessly create new doctrine. See "Developments in the Law: The Interpretation of State Constitutional Rights," supra,
 
 95 Harv. L. Rev. 1357
 
 -58 ("This interstitial role recognizes federal doctrine as a settled floor of rights and asks whether and how to criticize, amplify, or supplement this doctrine to yield more extensive constitutional protections.
 
 The state court's role is not to construct a complete system of fundamental rights from the ground up.
 
 " [Emphasis added; footnote omitted.] ); see also M. Kelman, supra,
 
 27 Wayne L. Rev. 429
 
 ("a separation of the state issue from the federal need not occur until the individual rights claim has been considered and rejected on its federal merits").
 Finally, looking to the federal constitution first will help to avoid creating unnecessary or unintended differences between federal law and state law. We should favor uniformity between the two constitutions when federal law is adequate to protect the rights of a party in a given case. As the decision in
 
 Mapp
 
 v.
 
 Ohio
 
 , supra,
 
 367 U.S. at 643
 
 ,
 
 81 S.Ct. 1684
 
 , demonstrates, deviations between federal and state law can ultimately undermine our constitutional order, especially in the area of search and seizure jurisprudence. Divergent search and seizure principles encourage the criminal law equivalent of forum shopping, at least for crimes that might also be prosecuted under federal law.
 
 [8]
 
 Because our state constitution does
 not bind federal authorities or federal courts; see, e.g.,
 
 United States
 
 v.
 
 Pforzheimer
 
 ,
 
 826 F.2d 200
 
 , 204 (2d Cir. 1987) ; we are powerless to prevent state authorities who have obtained evidence in violation of the state constitution from providing it to federal authorities for their use in a federal prosecution, undermining both the legitimacy and value of protections granted by our state constitution. See, e.g., R. Range, supra,
 
 45 Wash. & Lee L. Rev. 1499
 
 . Indeed, the Second Circuit has made clear that federal district courts may admit evidence even if seized in violation of a state constitution.
 
 United States
 
 v.
 
 Pforzheimer
 
 , supra, at 204. It was precisely this type of practice that led the United States Supreme Court to hasten its incorporation process in the 1960s as a means of creating uniformity between federal and state law. See R. Range, supra, 1500-1501; cf.
 
 Mapp
 
 v.
 
 Ohio
 
 , supra, at 657-58,
 
 81 S.Ct. 1684
 
 . Resorting to the state constitution only when necessary to fill a gap left by the federal constitution will help reduce the opportunity for similar problems to arise from our state constitutional interpretation.
 

 For the foregoing reasons, I would simplify our decision and decide it under the federal constitution, consistent with the Second Circuit's decision in
 
 Thomas
 
 . Because the majority has unnecessarily opted to resolve the case under our state constitution without first resolving the federal constitutional claim, I concur in the judgment only.
 

 Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."
 

 The state appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.
 

 The defendant also claims, as the trial court concluded, that the canine sniff of his residence violated the fourth amendment's prohibition against unreasonable searches and seizures. We recently have explained that when the issue presented is one of first impression under both the state and federal constitutions, it is appropriate to consider the state constitutional claim first, "turning to the federal claim only after determining that the appellant's state constitutional [challenge] will not succeed."
 
 State
 
 v.
 
 Santiago
 
 ,
 
 318 Conn. 1
 
 , 16 n.11,
 
 122 A.3d 1
 
 (2015). As we discuss more fully in part IV of this opinion, we see no reason to deviate from this approach when, as in the present case, the issue is not truly settled under the federal constitution, such that we cannot predict to a reasonable degree of certainty how the United States Supreme Court would resolve the issue. See, e.g.,
 
 State
 
 v.
 
 Joyce
 
 ,
 
 229 Conn. 10
 
 , 16 n.6,
 
 639 A.2d 1007
 
 (1994) ("we need not speculate whether the defendant's expectation of privacy ... would be reasonable under the fourth amendment, because the defendant invokes the state constitution as well as the federal constitution").
 

 We note that the state makes no claim either that the Berlin police had a reasonable and articulable suspicion that the defendant's condominium unit contained marijuana or that such a level of suspicion would suffice to render the canine sniff lawful without a warrant predicated on probable cause.
 

 As the court in
 
 Caballes
 
 explained, "[o]fficial conduct that does not compromise any legitimate interest in privacy is not a search subject to the [f]ourth [a]mendment .... [The court has] held that any interest in possessing contraband cannot be deemed legitimate, and thus ... governmental conduct that
 
 only
 
 reveals the possession of contraband compromises no legitimate privacy interest .... This is because the expectation that certain facts will not come to the attention of the authorities is not the same as an interest in privacy that society is prepared to consider reasonable .... In [
 
 Place
 
 , the court] treated a canine sniff by a [well trained narcotics detection] dog as
 
 sui generis
 
 because it discloses only the presence or absence of narcotics, a contraband item." (Citations omitted; emphasis in original; internal quotation marks omitted.)
 
 Illinois
 
 v.
 
 Caballes
 
 ,
 
 supra,
 

 543 U.S. at 408-409
 
 ,
 
 125 S.Ct. 834
 
 .
 

 "[O]ur adoption of an analytical framework or methodology used under the federal constitution does not compel this court to reach the same outcome that a federal court might reach when the methodology is applied to a particular set of factual circumstances. Even when the state and [f]ederal [c]onstitutions contain the same [or similar] language and employ the same methodology to govern the interpretation and application of that language [as they do in the present case], the ultimate constitutional decision often will turn [on] a factual assessment of how society feels about certain matters or how society functions under various conditions .... In each instance it could matter greatly which society you are talking about: a privacy claim lacking the national consensus necessary to trigger federal constitutional protection might still enjoy local support strong enough to dictate state constitutional protection ...." (Internal quotation marks omitted.)
 
 State
 
 v.
 
 Joyce
 
 ,
 
 229 Conn. 10
 
 , 18 n.12,
 
 639 A.2d 1007
 
 (1994).
 

 As the United States Supreme Court has recently underscored, the fourth amendment protects against government infringement of an individual's reasonable expectation of privacy and also against the government's nonconsensual physical intrusion into a person's private property. See
 
 Florida
 
 v.
 
 Jardines
 
 , supra,
 
 133 S.Ct. at 1414
 
 ("By reason of our decision in [
 
 Katz
 
 ], property rights are not the sole measure of [f]ourth [a]mendment violations .... [Al]though
 
 Katz
 
 may add to the baseline, it does not subtract anything from the [fourth] [a]mendment's protections when the [g]overnment
 
 does
 
 engage in [a] physical intrusion of a constitutionally protected area ...." [Citations omitted; emphasis in original; internal quotation marks omitted.] ). Thus, in
 
 Jardines
 
 , because the police officers "were gathering information in an area belonging to [the respondent, Joelis] Jardines and immediately surrounding his house," that is, in the curtilage of the house, an area that "enjoys protection as part of the home itself";
 
 id.
 
 ; that intrusion constituted a search under the fourth amendment.
 
 Id., at 1417-18
 
 . Because we resolve the issue raised in the present case on the basis of the defendant's reasonable expectation of privacy under article first, § 7, of the state constitution, we need not address the defendant's alternative state constitutional claim that the police activity at issue was unlawful because it occurred in the curtilage of his condominium unit.
 

 We note that, in
 
 State
 
 v.
 
 Brown
 
 ,
 
 198 Conn. 348
 
 ,
 
 503 A.2d 566
 
 (1986), this court stated that, because a home owner has a reasonable expectation of privacy in the curtilage of the home, curtilage "does not provide a separate basis for fourth amendment protection," and "[t]he focus remains the reasonable expectation of privacy [that] an individual possesses in the area."
 
 Id.,
 
 at 359 n.9,
 
 503 A.2d 566
 
 . We disavow this statement because it is inconsistent with the fourth amendment analysis employed by the United States Supreme Court in
 
 Jardines
 
 .
 

 Neither the language nor the history of article first, § 7, bears on our analysis. With respect to the latter consideration, we previously have observed that "the history of article first, § 7, sheds no light on the appropriate standard to be applied to a canine sniff because that investigative technique was unknown at the time our constitution was adopted in 1818."
 
 State
 
 v.
 
 Waz
 
 , supra,
 
 240 Conn. at
 
 374 n.15,
 
 692 A.2d 1217
 
 .
 

 In reaching its determination in
 
 Thomas
 
 , the Second Circuit relied principally on "the heightened privacy interest that an individual has in his dwelling place."
 
 United States
 
 v.
 
 Thomas
 
 ,
 
 supra,
 

 757 F.2d at 1366
 
 . Acknowledging that warrantless canine sniffs of baggage at a public airport had recently been held constitutional; see
 
 United States
 
 v.
 
 Place
 
 ,
 
 supra,
 
 462 U.S. at 698,
 
 103 S.Ct. 2637
 
 ; the court in
 
 Thomas
 
 explained that "a practice that is not intrusive in a public airport may be intrusive when employed at a person's home. Although using a dog sniff for narcotics may be discriminating and unoffensive relative to other detection methods, and will disclose only the presence or absence of narcotics ... it remains a way of detecting the contents of a private, enclosed space. With a trained dog police may obtain information about what is inside a dwelling that they could not derive from the use of their own senses. Consequently, the officers' use of a dog is not a mere improvement of their sense of smell, as ordinary eyeglasses improve vision, but is a significant enhancement accomplished by a different, and far superior, sensory instrument. ... [T]he defendant had a legitimate expectation that the contents of his closed apartment would remain private, that they could not be 'sensed' from outside his door. Use of the trained dog impermissibly intruded on that legitimate expectation." (Citation omitted.)
 
 United States
 
 v.
 
 Thomas
 
 ,
 
 supra, at 1366-67
 
 .
 

 Although the facts of
 
 Jardines
 
 are similar to the facts in the present case in certain respects, as we explain more fully hereinafter, they are also materially different in at least two important respects. First, the canine sniff in
 
 Jardines
 
 was conducted on the front porch of a single-family house; see
 
 Florida
 
 v.
 
 Jardines
 
 , supra,
 
 133 S.Ct. at
 
 1413 ; whereas the canine sniff in the present case occurred in the common hallway of a condominium complex. Second, the court in
 
 Jardines
 
 elected to decide the case on the basis of the property rights of the respondent, Joelis Jardines, as the owner and resident of the house. See
 
 id., at 1417
 
 . In contrast, we resolve the present case on the basis of the defendant's reasonable expectation of privacy in his condominium unit.
 

 In light of its determination that the police officers had exceeded the scope of their invitation to enter Jardines' property, the court concluded that it did not need to "decide whether the officers' investigation of Jardines' home [also] violated his expectation of privacy under
 
 Katz
 
 ."
 
 Florida
 
 v.
 
 Jardines
 
 , supra,
 
 133 S.Ct. at 1417
 
 . "One virtue of the [f]ourth [a]mendment's [property rights] baseline," the court explained, "is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred."
 
 Id.
 

 See, e.g.,
 
 United States
 
 v.
 
 Elliot
 

 t
 
 ,
 
 50 F.3d 180
 
 , 186-87 (2d Cir. 1995) (no expectation of privacy that would preclude search of areas believed to be unleased when officers acted in reasonable reliance on property manager's consent), cert. denied,
 
 516 U.S. 1050
 
 ,
 
 116 S.Ct. 715
 
 ,
 
 133 L.Ed.2d 669
 
 (1996) ;
 
 United States
 
 v.
 
 Nohara
 
 ,
 
 3 F.3d 1239
 
 , 1242-43 (9th Cir. 1993) (no reasonable expectation of privacy that would prevent officers from peeking around corner of hallway to spy on defendant);
 
 United States
 
 v.
 
 Acosta
 
 ,
 
 965 F.2d 1248
 
 , 1251-53 (3d Cir. 1992) (no reasonable expectation of privacy that would preclude officer's entry into apartment building);
 
 United States
 
 v.
 
 Holland
 
 ,
 
 755 F.2d 253
 
 , 255-57 (2d Cir.) (no reasonable expectation of privacy that would prevent arrest in vestibule of two-story, two apartment house), cert. denied,
 
 471 U.S. 1125
 
 ,
 
 105 S.Ct. 2657
 
 ,
 
 86 L.Ed.2d 274
 
 (1985) ;
 
 United States
 
 v.
 
 Arboleda
 
 ,
 
 633 F.2d 985
 
 , 991-92 (2d Cir. 1980) (no legitimate expectation of privacy in bag of cocaine found on ledge near fire escape), cert. denied,
 
 450 U.S. 917
 
 ,
 
 101 S.Ct. 1362
 
 ,
 
 67 L.Ed.2d 343
 
 (1981) ;
 
 United States
 
 v.
 
 Kelly
 
 ,
 
 551 F.2d 760
 
 , 763, 765 (8th Cir.) (no reasonable expectation of privacy in evidence found under common stairwell in apartment building), cert. denied,
 
 433 U.S. 912
 
 ,
 
 97 S.Ct. 2981
 
 ,
 
 53 L.Ed.2d 1097
 
 (1977), and cert. denied sub nom.
 
 Powell
 
 v.
 
 United States
 
 ,
 
 433 U.S. 912
 
 ,
 
 97 S.Ct. 2981
 
 ,
 
 53 L.Ed.2d 1097
 
 (1977) ;
 
 United States
 
 v.
 
 Eisler
 
 ,
 
 567 F.2d 814
 
 , 816 (8th Cir. 1977) (no reasonable expectation of privacy that would prevent officer's watching and listening to defendant from common hallway);
 
 United States
 
 v.
 
 Cruz Pagan
 
 ,
 
 537 F.2d 554
 
 , 557-58 (1st Cir. 1976) (no reasonable expectation of privacy that would preclude officer's entry into underground shared garage);
 
 United States
 
 v.
 
 Bain
 
 ,
 
 155 F.Supp.3d 107
 
 , 117 (D. Mass. 2015) (no reasonable expectation of privacy that would preclude officers from entering common hallways, which "served as passageways routinely used for egress and ingress to the apartment units," and defendant "could not exclude others from or control access to these areas" or "reasonably expect that the goings-on in [these areas] would remain secret" [internal quotation marks omitted] );
 
 United States
 
 v.
 
 Broadway
 
 ,
 
 580 F.Supp.2d 1179
 
 , 1188, 1193-94 (D. Colo. 2008) (no expectation of privacy that would prevent officer from entering common hallway after authorization by groundskeeper with apparent authority);
 
 United States
 
 v.
 
 Romano
 
 ,
 
 388 F.Supp. 101
 
 , 104-105 (E.D. Pa. 1975) (no reasonable expectation of privacy in drainpipe at rear of townhouse).
 

 Several Connecticut cases support essentially the same proposition. See, e.g.,
 
 State
 
 v.
 
 Pierre
 
 ,
 
 139 Conn.App. 116
 
 , 118-19, 128-29,
 
 54 A.3d 1060
 
 (2012) (seizure of gun in open attic space attached to common hallway of rooming house was lawful because defendant had no reasonable expectation of privacy in common hallway or attic), aff'd,
 
 311 Conn. 507
 
 ,
 
 88 A.3d 489
 
 (2014) ;
 
 State
 
 v.
 
 Alexander
 
 ,
 
 115 Conn.App. 1
 
 , 4, 8-9,
 
 972 A.2d 252
 
 (no expectation of privacy in common hallway of two-family house when police officer entered unlocked door and knocked on defendant's apartment door), cert. denied,
 
 293 Conn. 920
 
 ,
 
 979 A.2d 491
 
 (2009) ;
 
 State
 
 v.
 
 Torres
 
 ,
 
 36 Conn.App. 488
 
 , 498-500,
 
 651 A.2d 1327
 
 (no reasonable expectation of privacy in common areas of multitenant building when police legally entered common areas and conducted visual surveillance of defendant), cert. denied,
 
 232 Conn. 912
 
 ,
 
 654 A.2d 357
 
 (1995) ; but cf.
 
 State
 
 v.
 
 Reddick
 
 ,
 
 207 Conn. 323
 
 , 332-34,
 
 541 A.2d 1209
 
 (1988) (defendant did have reasonable expectation of privacy in common basement in two-family home when basement was not readily accessible to outsiders).
 

 The state further asserts that the rationale of the court in
 
 Caballes
 
 -which was decided after
 
 Kyllo
 
 -did not implicate the location of the canine sniff and alert; if it did, the state maintains, the court in
 
 Caballes
 
 "would have simply disregarded or distinguished
 
 Kyllo
 
 on the basis that the
 
 Kyllo
 
 search was of a home." (Internal quotation marks omitted.)
 

 For purposes of this appeal, we assume that drug sniffing dogs are adequately precise such that they do not yield anything more than de minimus rates of error. But see
 
 Illinois
 
 v.
 
 Caballes
 
 ,
 
 supra,
 

 543 U.S. at 411
 
 ,
 
 125 S.Ct. 834
 
 (Souter, J., dissenting) ("[t]he infallible dog ... is a creature of legal fiction").
 

 Hereinafter, all references in this opinion to
 
 Jardines
 
 are to the United States Supreme Court's decision in
 
 Florida
 
 v.
 
 Jardines
 
 , supra,
 
 133 S.Ct. at 1409
 
 .
 

 The state also refers us to
 
 People
 
 v.
 
 Jones
 
 ,
 
 279 Mich.App. 86
 
 , 93,
 
 755 N.W.2d 224
 
 (2008), appeal denied,
 
 485 Mich. 1040
 
 ,
 
 776 N.W.2d 902
 
 (2010), in which the Michigan Appellate Court concluded that a canine sniff of the porch of a house-apparently a freestanding, single-family residence-was not a search under the federal constitution. Id., at 94-95,
 
 755 N.W.2d 224
 
 . Following
 
 Jardines
 
 , however,
 
 Jones
 
 is no longer good law.
 

 The United States District Court for the District of Massachusetts, considering itself bound by squarely applicable First Circuit precedent, similarly concluded that the area in front of an apartment door in a multiunit building "was not a separate area ... subject to [the tenant's] exclusive control and thus [did] not constitute curtilage." (Internal quotation marks omitted.)
 
 United States
 
 v.
 
 Bain
 
 ,
 
 155 F.Supp.3d 107
 
 , 120 (D. Mass. 2015). The court in
 
 Bain
 
 noted, however, that "[a] number of persuasive considerations weigh in favor of applying the concept of curtilage in the apartment context generally and in this case in particular."
 
 Id., at 118-19
 
 . Specifically, after analyzing the relevant factors identified by the United States Supreme Court in
 
 United States
 
 v.
 
 Dunn
 
 , supra,
 
 480 U.S. at 301
 
 ,
 
 107 S.Ct. 1134
 
 , the District Court determined that the "area surrounding the door" of the apartment in question was in "immediate proximity to the home," it was part of the "larger enclosure" of the locked building, it "might have [been] used ... as an extension of the home similar to a front porch," and "residents took steps to protect the area from the general public, by keeping the outer door ... locked."
 
 United States
 
 v.
 
 Bain
 
 ,
 
 supra, at 119-20
 
 .
 

 We note that, in
 
 State
 
 v.
 
 Williams
 
 ,
 
 862 N.W.2d 831
 
 , 832, 838 (N.D. 2015), the North Dakota Supreme Court recently reaffirmed its reasoning and holding in
 
 Nguyen
 
 , concluding that the defendant, Andrew Robert Williams, the owner of a condominium in a four unit condominium building, could not prevail on his claim that the state violated his fourth amendment rights by conducting a warrantless canine sniff from the common hallway of the building and immediately outside the door to Williams' unit. As in
 
 Nguyen
 
 , the court in
 
 Williams
 
 determined that the common hallway was not curtilage and that Williams had no reasonable expectation of privacy in the area from which the search was conducted.
 
 Id.,
 
 at 837-38 ; see also
 
 State
 
 v.
 
 Foncette
 
 ,
 
 238 Ariz. 42
 
 , 45-46,
 
 356 P.3d 328
 
 (App. 2015) (although defendant, hotel guest, was entitled to constitutional protection against unreasonable searches and seizures that infringed on his expectation of privacy within his room, he had no reasonable expectation of privacy in hallway outside his room from where dog sniff, which could reveal only contraband, was conducted, and defendant also lacked reasonable expectation of privacy in drugs found in his room following dog's alert in front of his hotel door, because any interest that he had in possessing contraband was not deemed legitimate by society).
 

 We also agree with the Seventh Circuit that, as a matter of policy, "[d]istinguishing
 
 Jardines
 
 based on the differences between the front porch of a stand-alone house and the closed hallways of an apartment building draws arbitrary lines."
 
 United States
 
 v.
 
 Whitaker
 
 ,
 
 supra,
 

 820 F.3d at 854
 
 . "First, there is the middle ground between traditional apartment buildings and [single-family] houses. How would courts treat a split-level duplex? Perhaps even one that had been converted from a house into apartments? Does the number of units in the building matter, or do all [multiunit] buildings lack the protection
 
 Jardines
 
 gives to single-family buildings? And what about garden apartments whose doors, like houses, open directly to the outdoors?"
 
 Id.
 

 As we have indicated; see footnote 4 of this opinion; the state does not contend that a lesser standard than probable cause applies to the canine sniff that we have identified as a search for purposes of article first, § 7.
 

 See, e.g.,
 
 State
 
 v.
 
 Zidel
 
 ,
 
 156 N.H. 684
 
 , 686,
 
 940 A.2d 255
 
 (2008) (addressing federal constitutional claim before state constitutional claim because issue was definitively settled under federal constitution).
 

 Of course, whether the federal constitution definitively resolves the claim in the defendant's favor must be determined on a case-by-case basis. To conclude that it does in any given case, we must be able to say with a high degree of confidence that the United States Supreme Court, if presented with the federal constitutional claim, would decide it in favor of the defendant.
 

 Although Justice Zarella agrees with this approach-that is, deciding constitutional claims under the state constitution when the issue has not been truly settled under the federal constitution-he nevertheless proceeds to explain why we should adopt the so-called "interstitial approach" to state constitutional adjudication and reject the so-called "primacy" approach. As Justice Zarella explains, under the interstitial approach, a court turns first to the federal constitutional claim, and only if the defendant cannot prevail on that claim does the court then consider the claim under the state constitution. Under the primacy approach, a court looks first to the state constitution and resorts to the federal constitution only if the defendant's state constitutional claim is unavailing. It is unclear to us why Justice Zarella advocates an interstitial approach even as he accepts the premise that a state constitutional claim is properly decided first when the federal constitutional issue remains unsettled. In any event, in our view, it is most sensible and practical simply to decide the constitutional claim under the federal constitution if the law thereunder is truly settled and the defendant prevails; if the law is not settled under the federal constitution, or if it is settled but in favor of the state, we then look first to the state constitution.
 

 Of course, there are other sound reasons to decide state constitutional issues first unless the issue is truly settled under the federal constitution; see, e.g., 1 J. Friesen, State Constitutional Law: Litigating Individual Rights, Claims, and Defenses (4th Ed. 2006) §§ 1.01 [2] through 1.04, pp. 1-4 through 1-28; W. Horton, The Connecticut State Constitution (2d Ed. 2012) pp. 36-37; D. Braithwaite, supra,
 
 33 Rutgers L.J. 32
 
 -47; J. Landau, "Some Thoughts About State Constitutional Interpretation,"
 
 115 Penn. St. L. Rev. 837
 
 , 845-46 (2011) ; perhaps most significantly, the importance of ensuring that our state constitution is appropriately recognized as a source of rights that are both separate from and independent of, and sometimes greater than, the rights afforded under the federal constitution.
 

 Indeed, in her dissenting opinion, Justice Espinosa not only disagrees that the federal constitutional issue presented by this appeal is settled in favor of the defendant, but she suggests that
 
 Thomas
 
 was wrongly decided and concludes that the defendant
 
 cannot
 
 prevail under the federal constitution.
 

 Numerous state courts have also rejected
 
 Thomas
 
 and noted that it has been the subject of recurring criticism. See, e.g.,
 
 Nelson
 
 v.
 
 State
 
 ,
 
 867 So.2d 534
 
 , 536-37 (Fla. App. 2004), review denied,
 
 115 So.3d 1001
 
 (Fla. 2013) ;
 
 Hoop
 
 v.
 
 State
 
 , supra,
 
 909 N.E.2d at
 
 467 ;
 
 Fitzgerald
 
 v.
 
 State
 
 ,
 
 153 Md.App. 601
 
 , 675-76,
 
 837 A.2d 989
 
 (2003), aff'd,
 
 384 Md. 484
 
 ,
 
 864 A.2d 1006
 
 (2004) ;
 
 People
 
 v.
 
 Jones
 
 ,
 
 279 Mich.App. 86
 
 , 93 n.3,
 
 755 N.W.2d 224
 
 (2008), appeal denied,
 
 485 Mich. 1040
 
 ,
 
 776 N.W.2d 902
 
 (2010) ;
 
 State
 
 v.
 
 Washburn
 
 ,
 
 201 N.C.App. 93
 
 , 99,
 
 685 S.E.2d 555
 
 (2009), review denied,
 
 363 N.C. 811
 
 ,
 
 692 S.E.2d 876
 
 (2010) ;
 
 State
 
 v.
 
 Smith
 
 ,
 
 327 Or. 366
 
 , 375,
 
 963 P.2d 642
 
 (1998).
 

 In fact, Justice Zarella acknowledges that Justice Espinosa, in her dissent, "has raised significant distinctions" between the issue presented in this case and the related issues decided by the United States Supreme Court in other cases. It is in large measure because of these "significant distinctions" that we cannot fairly say that the issue is truly settled under the federal constitution.
 

 We acknowledge that, generally, Second Circuit precedent presumptively carries particular weight with this court when we are
 
 deciding
 
 an issue of federal law. E.g.,
 
 Szewczyk
 
 v.
 
 Dept. of Social Services
 
 ,
 
 275 Conn. 464
 
 , 475,
 
 881 A.2d 259
 
 (2005) (decisions of Second Circuit Court of Appeals " 'carry particularly persuasive weight' " in our interpretation of federal law). Contrary to Justice Zarella's assertion, however, this general principle has no applicability with respect to the threshold, and entirely separate, determination of
 
 whether
 
 to decide a claim first under the federal constitution or first under the state constitution. While there are sound reasons to give particular weight to the Second Circuit's interpretation of federal law when we are resolving a claim under federal law-most significantly, to avoid the situation in which a litigant would prevail on the identical federal claim in one jurisdiction but not in the other-no such consideration has any bearing on which constitutional claim should be decided first. This point-that a holding of the Second Circuit should not dictate the order in which we address claims raised under both the federal and state constitutions-may be illustrated as follows. If we address the state constitutional claim first and decide it in favor of the defendant, there is no reason to address the federal constitutional claim; for purposes of that case, the defendant is entitled to prevail under the state constitution, and it simply does not matter which way the claim would have been decided under the federal constitution. If we decide the state constitutional claim first, but the state prevails, we then must turn to the federal constitution to determine whether it affords greater protection to the defendant than the state constitution. In neither case is there any possibility that the very same claim would be decided differently under the same law because the defendant's two separate and distinct claims implicate two different constitutions.
 

 We also disagree with Justice Zarella that an issue of federal constitutional interpretation is settled solely because the Second Circuit has decided it in a certain way. Because the United States Supreme Court is the final arbiter of the meaning and scope of the federal constitution, we cannot reasonably characterize a federal constitutional issue as settled unless we can confidently predict how the United States Supreme Court would resolve it. If we are unable to do so-and, as we explain more fully hereinafter, we certainly cannot make such a prediction in the present case-there simply is no persuasive reason to address the issue first under the federal constitution. Consequently, there is no justification for this court to entertain the fiction, advocated by Justice Zarella, that a federal constitutional question is settled merely because it is settled in the Second Circuit. Ironically, because Justice Zarella acknowledges that we do not blindly follow Second Circuit precedent, if we were to adopt his approach and first address any issue of federal constitutional interpretation that has been resolved by the Second Circuit, we would be creating the very problem that Justice Zarella seeks to avoid, namely, the possibility that this court would disagree with the Second Circuit's interpretation of a federal constitutional provision.
 

 With respect to his repudiation of Justice Kagan's reliance on the privacy based rationale to support her determination that the conduct of the police in
 
 Jardines
 
 violated the fourth amendment, Justice Alito explained that he saw "no basis for concluding that the occupants of a dwelling have a reasonable expectation of privacy in odors that emanate from the dwelling and reach spots where members of the public may lawfully stand."
 
 Florida
 
 v.
 
 Jardines
 
 , supra,
 
 133 S.Ct. at 1424
 
 (Alito, J., dissenting).
 

 The majority observes that the state has not argued that the police had a reasonable and articulable suspicion that the defendant was growing marijuana plants in his condominium unit, or claimed that if it had, that suspicion would have justified the dog sniff. The explanation is clear. It is the state's position that there was no search of the defendant's condominium unit, either under the fourth amendment of the federal constitution or article first, § 7, of the state constitution. Accordingly, the question of whether the police had a reasonable and articulable suspicion and whether such a level of belief would have been constitutionally sufficient was irrelevant to the state's argument.
 

 Whether I would agree with Justice Espinosa's position under the state constitution is another matter, and one that I need not address in view of my reliance on the federal constitution.
 

 The majority cites a number of decisions that originally criticized the decision in
 
 Thomas
 
 , but the criticism in those cases does not convince me to depart from that decision. Most significantly, each of these cases criticizing
 
 Thomas
 
 was decided before
 
 Jardines
 
 , and many were decided even before
 
 Kyllo
 
 . It is questionable whether, in light of
 
 Jardines
 
 , these courts would maintain their original criticism. For example, the Eighth Circuit concluded, before
 
 Jardines
 
 , that dog sniffs at apartment doors are not searches.
 
 United States
 
 v.
 
 Scott
 
 ,
 
 610 F.3d 1009
 
 , 1015 (8th Cir. 2010), cert. denied,
 
 562 U.S. 1160
 
 ,
 
 131 S.Ct. 964
 
 ,
 
 178 L.Ed.2d 794
 
 (2011). But at least one District Court in that circuit has concluded that the Eighth Circuit's decision in
 
 Scott
 
 is no longer good law after
 
 Jardines
 
 . See, e.g.,
 
 United States
 
 v.
 
 Hopkins
 
 , United States District Court, Docket No. CR14-0120,
 
 2015 WL 4087054
 
 (N.D. Iowa July 6, 2015) (concluding that, although, "prior to
 
 Jardines
 
 , officers could rely on Eighth Circuit precedent in conducting dog sniffs outside the doorways of residences in an apartment complex," these dog sniffs were now searches under fourth amendment).
 

 Thus, beginning with a federal constitutional analysis makes sense as a practical matter because any interpretation of our state constitution requires that we analyze the meaning of federal law in any event. See
 
 State
 
 v.
 
 Geisler
 
 ,
 
 222 Conn. 672
 
 , 685,
 
 610 A.2d 1225
 
 (1992). If, in analyzing federal law for the purpose of interpreting the state constitution, this court determines that federal law supports the relief being sought, there is little reason to continue with a state constitutional analysis.
 

 Of course, this question does not arise when a party has made a claim under only the state constitution, which typically happens when the federal constitution clearly does not provide a basis for relief or when a party is seeking greater protection under the state constitution. See, e.g.,
 
 State
 
 v.
 
 Skok
 
 , supra, 318 Conn. at 701 and n.3,
 
 122 A.3d 608
 
 ;
 
 Doe
 
 v.
 
 Hartford Roman Catholic Diocesan Corp
 
 .,
 
 317 Conn. 357
 
 , 402-403,
 
 119 A.3d 462
 
 (2015) ;
 
 State
 
 v.
 
 Kelly
 
 ,
 
 313 Conn. 1
 
 , 12,
 
 95 A.3d 1081
 
 (2014) ;
 
 State
 
 v.
 
 Williams
 
 ,
 
 311 Conn. 626
 
 , 628-29,
 
 88 A.3d 534
 
 (2014) ;
 
 State
 
 v.
 
 DeFusco
 
 ,
 
 224 Conn. 627
 
 , 631-32,
 
 620 A.2d 746
 
 (1993) ;
 
 State
 
 v.
 
 Marsala
 
 ,
 
 216 Conn. 150
 
 , 159-61,
 
 579 A.2d 58
 
 (1990) ;
 
 State
 
 v.
 
 Dukes
 
 ,
 
 209 Conn. 98
 
 , 100 and n.4,
 
 547 A.2d 10
 
 (1988).
 

 The "Warren Court" signifies the group of judges that comprised the United States Supreme Court when Earl Warren served as Chief Justice.
 

 Of course, state constitutions continue to apply exclusively in matters not addressed by the federal constitution and for those federal guarantees that the United States Supreme Court has applied to the states through the incorporation doctrine.
 

 We should interpret our constitution differently from the federal constitution only when necessary to protect the rights of our citizens; otherwise, we risk unnecessarily encouraging a "reverse silver platter" problem-essentially the mirror image of the problem identified in
 
 Mapp
 
 . See R. Range, supra,
 
 45 Wash. & Lee L. Rev. 1499
 
 (discussing "reverse silver platter" practice that arises when federal officials may use evidence inadmissible in state court). Whenever we interpret our state constitution to forbid the use of evidence that would be allowed in federal court under the federal constitution, we risk encouraging state law enforcement officials to turn evidence not permitted in a state proceeding over to federal authorities for use in a federal proceeding.